In re NATIONAL HOME & HOTEL SUPPLY CO.

(District Court, E. D. Michigan, S. D.   August 17, 1915.)

1. BANKRUPTCY ⬬140—RECLAIMING PROPERTY FROM TRUSTEE.
     Where a transaction between a manufacturer and a retail dealer, adjudged a bankrupt, created a bona fide agency and consignment contract, which was performed, the manufacturer could reclaim the merchandise from the trustee.
     [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. ⬬140.]

2. BANKRUPTCY ⬬140—RECLAIMING PROPERTY FROM TRUSTEE.
     Where a contract between a manufacturer and a retail dealer, adjudged a bankrupt, was one of sale with reservation of title in the manufacturer as security, but no proper instrument was filed or recorded, the manufacturer could not reclaim the merchandise from the trustee.
     [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. ⬬140.]

3. BANKRUPTCY ⬬140—RECLAIMING PROPERTY FROM TRUSTEE.
     In determining whether a contract between a manufacturer and a retail dealer, adjudged a bankrupt, was one of agency and consignment, so that the manufacturer could reclaim the merchandise from the trustee, or a sale with a reservation of title as security, unaccompanied by any proper instrument filed or recorded, so that the trustee could retain the merchandise, the court must take into account what manner of contract

⬬For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the parties intended to make, what they agreed to do, and the manner in which they carried it out in actually working under it.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. ☞140.]

4. BANKRUPTCY ☞140—RECLAIMING PROPERTY FROM TRUSTEE—"CONSIGNMENT."

A retail dealer opened negotiations with a seller of hand-painted china, suggesting consignments. The seller selected the merchandise, shipped it, and kept the dealer supplied without orders from him. An accounting was given by the dealer after 30 days, and he was required to pay only for pieces sold. The merchandise remained the property of the seller until sold. The parties by conduct showed that they considered the transaction a consignment. The dealer presented to the seller an accounting, headed "Sold for [Seller]." The seller did not take out insurance on the merchandise, which was commingled with other goods. The dealer failed to give the merchandise a separate department as agreed, but the seller was ignorant of it, and all the merchandise bore the name of the seller. No person was defrauded by the transaction. *Held*, that the merchandise was consigned to the dealer, and, on his being adjudged a bankrupt, the seller could reclaim articles on hand from the trustee, notwithstanding Bankr. Act July 1, 1898, c. 541, 30 Stat. 544, as amended by Act June 25, 1910, c. 412, 36 Stat. 838, and the trustee must also pay the proceeds of any merchandise sold by the receiver, and account for merchandise sold by the dealer prior to filing of petition in bankruptcy and not accounted for; so that the seller might participate to that extent as an unsecured creditor.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 225; Dec. Dig. ☞140.

For other definitions, see Words and Phrases, First and Second Series, Consignment.]

In Bankruptcy. In the matter of the National Home & Hotel Supply Company, bankrupt. Proceeding by Madeline Kaiser, doing business as the M. Kaiser Art Company, to reclaim from the trustee in bankruptcy certain property. There was an order denying the petition, and said Kaiser petitions for a review. Reversed.

Selling & Brand, of Detroit, Mich., for petitioner.
Welsh, Crane & Kahn, of Detroit, Mich., for trustee.

TUTTLE, District Judge. A stipulated statement of facts constitutes the record herein. The following are the material facts taken therefrom:

Prior to the transactions between petitioner and bankrupt, petitioner had sold hand-painted china to the firm of Osborne, Boynton & Osborne on the usual terms of credit. The members of the above firm, or some of them, later organized the bankrupt corporation. On February 22, 1913, bankrupt, through its president, H. F. Osborne, wrote petitioner as follows:

"Before going any further, would like to know if you would be in a position to give us your line for Detroit on the consignment basis, providing we put in a nice department, and ran your line exclusive, for the American painted china, advertise it, and give it a separate department. You to keep us stocked with your complete line with enough pieces to supply the demand. We to give you an accounting of the stock at the end of each month, and remit for the pieces sold. To make a success of a line of this kind, it should have a big showing, and proper advertising, and we do not feel that we could

go to this expense, and pay for the goods that were not sold in the 10 or 30 days. This would not conflict with your arrangement with your selling agency in Milwaukee, as this would be your merchandise until sold. We have this same arrangement with other very important lines from manufacturers of very high class goods, and if it was not a good thing for them they certainly would not let us have the merchandise, and the same would apply to your goods. We would do everything in our power to market your line to the very best advantage in Michigan, and not bother your Wisconsin trade. If you cannot decide this matter right away, will leave same open until I am in Milwaukee, and you can consider the same in the meantime. If you think this would be a good thing for you, I will be very glad to send you a copy of memorandum of agreement, such as we have with other firms."

On March 6, 1913, bankrupt wrote petitioner in part as follows:

"You did not reply to my letter with reference to consigning a nice line of your ware for the retail trade, and take it for granted that you will not consider such a proposition, although I think you will make a mistake, as this department, if stocked with a nice line, would pay the both of us to be handled in this way."

There were no further negotiations until April, 1913, when the president of bankrupt, in its behalf, interviewed petitioner in Milwaukee. It was then orally agreed that the bankrupt should handle petitioner's merchandise in its store in Detroit, and that petitioner should ship goods to bankrupt upon "consignment." Nothing was said relative to bankrupt purchasing goods on credit. Bankrupt was to display the merchandise in its store, and advertise and sell it. The merchandise to be placed in bankrupt's store was to be suitable in quantity and variety to the probable demands of the Detroit trade. The terms outlined in the letter of February 22, 1913, were substantially agreed upon. The testimony shows that the parties referred to the transactions as "consignments." The merchandise to be placed was to be petitioner's complete line, and not a sample line. The number of sets of each variety were to be suitable to the probable demands of the Detroit trade. It was agreed that petitioner was to remain the owner of the goods until sold; that bankrupt was to render a monthly accounting, and remit according to list prices for all merchandise sold. Nothing was said about the payment of freight, but on the goods shipped bankrupt paid same. Nothing was said limiting the right of bankrupt to retail sales, nor forbidding it to sell on credit. There is no evidence that bankrupt sold any of petitioner's goods on credit or at wholesale.

Nothing was said requiring bankrupt to account for the identical money taken in for goods sold, or to keep said money separate, or to remit any portion of the identical money taken in. The bankrupt placed no orders with petitioner. All goods shipped were selected by petitioner. The following shipments were made pursuant to the foregoing arrangement:

| | |
|---|---|
| April 29, 1913 | $367.40 |
| May 7, 1913 | 70.50 |
| May 10, 1913 | 16.50 |
| June 21, 1913 | 60.50 |
| Total | $514.90 |

Petitioner testified her purpose in shipping merchandise to bankrupt was to secure an outlet for same in Detroit; that she was not satis-

fied to sell, and had refused to sell, bankrupt on the ordinary terms of credit; and that she desired to protect herself. An officer of the bankrupt testified that bankrupt desired to carry petitioner's line, but did not wish to pay cash for same according to the usual terms of credit. The invoice of shipment of April 29th is on petitioner's regular printed form of invoice, and in ink is written thereon "Consignment." Printed on all petitioner's regular form of invoice appears: "Terms net 30 days." The invoice of April 29th lists the goods and prices.

Invoices of the shipments of May 7th and May 10th are on the regular printed form. Upon receipt of such invoices, Osborne stamped one "Terms: On consignment," and the other "Memo." "Memo," in the business of bankrupt, indicated that the goods were received on consignment, or on a memorandum invoice, as distinguished from purchases on regular terms of credit. No debit was made to merchandise by bankrupt for any of these shipments, nor was petitioner credited in bankrupt's Accounts Payable book for the amounts thereof. Bankrupt's system of bookkeeping was such that, when it purchased merchandise on credit from any one, Merchandise Account was debited on receipt of the goods and the shipper credited in the Accounts Payable book. The merchandise accounts of bankrupt were kept in the front part of Accounts Payable book, the index to which, however, shows that pages 230 to 256, which were in the back part of the book, were devoted to "consigned goods." This book consists of the regular printed Accounts Payable form. The pages from 230 to 256 were changed in ink and headed "Consigned Goods." Petitioner's account appears on page 236, whereon the four shipments are listed, and under the column bearing the printed word "Terms" appears in ink entry "Memo" as to each shipment. Under the printed column headed "When Due" is entered in ink the words "When sold."

On June 2, 1913, bankrupt rendered its first accounting, which was really for the month of May, inclosing petitioner an itemized list of petitioner's goods on hand on May 31, 1913, showing goods sold amounting to $30.08. Two per cent. was deducted, leaving $29.48 marked as "Goods sold." A check for that amount was inclosed. This accounting bears the heading "May 31st, 1913, Stock M. Kaiser Art Company Merchandise on Hand." It also bears a notation, "Charge merchandise $30.08."

Petitioner testified that nothing was agreed as to discount. Upon receipt of this accounting, petitioner informed bankrupt that she desired an itemized statement of the goods sold, and under date of June 30, 1913, bankrupt rendered its second accounting, listing goods sold during the month of June, amounting to $16.20, less 2 per cent. discount, leaving the amount $15.88. This accounting is headed "Sold for M. Kaiser Art Company," and also "Charge merchandise $15.88." The respective checks for these goods sold were drawn on the general account of bankrupt, and after the checks were sent out Merchandise Account was debited for the amount of such checks. These debits appear in the books, and are the only debits for petitioner's wares shown against Merchandise Account.

Bankrupt advertised "Kaiser Art China" for sale, and displayed it with cardboard signs placed on or near the same bearing the words "Kaiser Art China." Bankrupt sold at prices determined by it, and kept as its profit whatever it received over the invoice prices. The goods were not displayed in a separate department. Slips were kept of all sales, for the purpose of checking up what was sold. All petitioner's china bore the name "Kaiser Art Company."

There was on hand, at the time the receiver took possession, petitioner's goods amounting to $332.60 at list prices, a portion of which have been sold by receiver under stipulation with petitioner. No claim is made that sales by bankrupt did not pass title, but petitioner contends that such sales were made for her by bankrupt as agent, or as factor, or bailee. No instrument, either in the form of a chattel mortgage or a conditional sale contract, was executed or recorded; the only agreement being as hereinbefore set forth. No rights of innocent third parties as subsequent purchasers or incumbrancers are involved, there being in question simply the rights of trustee as against petitioner.

[1, 2] The last word of our Circuit Court of Appeals on the questions involved herein is announced in the matter of John Deere Plow Company v. Mowry, 222 Fed. 1, —— C. C. A. ——. I have carefully analyzed that case in connection with the decision in Re Mishawaka Company v. Westveer, 191 Fed. 465, 112 C. C. A. 109 (Sixth Circuit). The question whether or not the agreement in the matter at bar constituted a conditional sale is not involved herein. It seems to me clear that the only question involved in this petition is whether the transaction herein created a contract of agency and consignment, or whether there was an actual sale of petitioner's goods to bankrupt with a reservation of title in petitioner by way of security. If it was a bona fide agency and consignment contract, and lived up to, then, as I understand the opinion in the John Deere Plow Company Case and the opinion in the Mishawaka Woolen Manufacturing Company Case, petitioner is entitled to reclaim. If, however, the contract was one of sale with a reservation of title by way of security, and no proper instrument was filed or recorded, then the trustee is entitled to prevail.

[3] In determining whether the contract was one of agency and consignment, on the one hand, or a sale with reservation of title by way of security, on the other, it is apparent from the decisions of the courts, and especially those of our own Court of Appeals, that no one test can be applied, but that each case must be carefully and separately considered. In the final analysis we must take into account what manner of contract the parties intended to make, what they agreed to do, and the manner in which they carried it out in actually working under it. All of these must be considered as an entirety, for the purpose of determining the actual character of the transaction.

[4] In arriving at my final conclusion I have endeavored, with the assistance of counsel, to tabulate the various elements present in this case which would tend to support petitioner's claim that the agreement herein constituted an agency and consignment, and also such elements as would tend to establish the theory of the trustee that the transaction was a sale with title reserved by way of security.

Roughly speaking, the points in favor of petitioner's theory are as follows: (1) At the opening of negotiations consignments were suggested. (2) Petitioner selected the merchandise shipped, and no orders were given by bankrupt; petitioner keeping bankrupt stocked with her line. (3) An accounting was to be given by bankrupt every 30 days. (4) Bankrupt was to pay only for pieces sold. (5) It was agreed that the merchandise should remain petitioner's property until sold. (6) The parties considered the transaction as a consignment, and treated the same as such in all their dealings, substantially living up to the terms of the agreement. (7) There is no evidence that any person was defrauded as a result of the transactions.

The points urged in favor of trustee's contention are the following: (1) There was no reservation of title to the proceeds of the goods sold, nor was bankrupt required to keep separate or remit the identical money taken in on sales of petitioner's goods, and bankrupt commingled such proceeds with its general funds. (2) Bankrupt paid the freight. (3) Petitioner's wares were not kept separate from other goods in bankrupt's store. (4) Bankrupt fixed the retail price and terms of sale. (5) Sales made by bankrupt of petitioner's wares conveyed good title to the purchaser. (6) No express provision in the agreement relating to the returning of unsold goods. (7) Petitioner desired to protect herself. (8) Petitioner did not expressly reserve for herself the right to sell the goods. (9) Only the first invoice was marked "Consignment" by petitioner. (10) There were no restrictions on the amount of goods bankrupt could sell, or as to the terms of such sales. (11) Bankrupt took a discount from the list price in remitting. (12) Good were shipped for the purpose of resale. (13) Bankrupt sold in its own name. (14) No accounting was had for the month of July. (15) Petitioner did not carry insurance on the merchandise.

Counsel for the respective parties have cited in their briefs and in their argument a number of cases; but, as I view the rule laid down in the John Deere Plow Company Case, these cases are only helpful in determining whether the presence or absence of certain elements in a given case will tend to deny or tend to establish the contract of consignment. A review of the points made shows, in favor of petitioner, that the parties contemplated the making of a consignment agreement, and never contemplated any other sort of an agreement. There is nothing in the record to show that they contemplated a sale of petitioner's wares to the bankrupt, or that the bankrupt should at any time incur any liability for goods not sold. In my opinion, at no time could petitioner have obtained a judgment against the bankrupt for goods not sold, on the theory that bankrupt was bound under the agreement to pay for same. There is nothing to indicate that the parties intended title to pass to bankrupt, and, unless the parties actually entered into a contract that in law amounted to a conveyance of title, petitioner must prevail.

I consider the fact that there was no obligation on the part of the bankrupt to pay for any unsold goods, and no right reserved in the petitioner to compel bankrupt to pay therefor, to be the greatest obstacle in the way of establishing a sale with a reservation of title as contended by counsel for trustee. I think the particular nature of the

wares in question is peculiarly adapted to a contract of consignment. While there is nothing in the record on the subject, we all know that hand-painted china, like hand embroidery, is often handled as a side line and under an agreement of agency and consignment.

In addition to the foregoing, and supporting petitioner's theory, the conduct of the parties, from beginning to end, shows, not only that they considered the transaction a consignment, but that they actually in good faith lived up to the agreement that they had made and treated the goods as consigned goods.

It is only necessary to refer to the fact that the invoice of April 29, 1913, on the regular printed form, was received by bankrupt, and bore an ink notation "Consignment." The subsequent invoices, while not marked by petitioner as consignments, were treated as such by the bankrupt, who stamped thereon, when the same were received, a notation that the same were on "Memo" or on "Consignment."

In its method of bookkeeping bankrupt treated the shipments as consignments. No charge was made to the Merchandise Account upon receipt of the shipments, nor was petitioner treated as a creditor for the amount thereof. The account was kept in a separate portion of the merchandise book actually devoted to consigned accounts, and the printed form of the book was modified to show that fact. The shipments were listed in the consignment portion of the book, and there was written in ink, on the sheet thereof, the fact that the goods were on "memo" and that the amounts of the invoices were due "when sold." The books of bankrupt were at all times kept in such a way that a statement of assets and liabilities taken therefrom would not have shown these goods as an asset of bankrupt.

The first shipment was made April 29, 1913, and the first accounting was on June 2, 1913, and the second accounting was on June 30, 1913. Bankrupt's first accounting was for the month of May, and was entitled "May 31, 1913, Stock M. Kaiser Art Company Merchandise on Hand." Petitioner was not satisfied with that form of accounting, and demanded a list of the goods actually sold. An accounting of the kind requested was given for the month of June, on June 30, 1913, such accounting being headed "Sold for M. Kaiser Art Company." The term "sold for" is one used by brokers, agents, and consignees, and not by owners of goods. The merchandise account was then debited for the first time for the amount of the goods sold. All of this is inconsistent with the theory of a contract of sale, and consistent with a contract of consignment.

Referring to the points raised by counsel for trustee, I do not think the fact that the bankrupt paid the freight prevents petitioner from recovering. The fact that petitioner took out no insurance on the wares is not inconsistent with her contention. The same is true as to the fixing of the prices for sale at retail. It is evident that, although it was not expressed, it was the intention of the parties that the bankrupt should have as its compensation or profit whatever it received for the merchandise sold over and above the prices listed by petitioner. While nothing was said giving the bankrupt the right to take the 2 per cent. discount, yet the fact that this discount was given or taken would be equivalent to allowing bankrupt additional compensation or

profit on goods sold. The points as to freight, insurance, discount, and compensation are discussed by the court in Re Reynolds (D. C.) 203 Fed. 162, 29 Am. Bankr. Rep. 145; Ellet-Kendal Shoe Company v. Martin, 222 Fed. 851, —— C. C. A. ——, 34 Am. Bankr. Rep. 502 (C. C. A., 8th Circuit, March, 1915); In re Columbus Buggy Company, 143 Fed. 859, 74 C. C. A. 611, 16 Am. Bankr. Rep. 759 (8th Circuit).

While commingling of petitioner's goods with other goods in the bankrupt's store might, under some circumstances, assist one in determining just what the parties intended, it is not entitled to a great deal of weight in this case. Its force is considerably weakened by the fact that the promise of the bankrupt was to give petitioner's wares a separate department, and to advertise them and display them. There is nothing to show that petitioner knew that this promise was not being fulfilled, and the distance of petitioner's residence from bankrupt's place of business and the short time that intervened between the shipment of the goods and the filing of the petition in bankruptcy would tend to negative such knowledge. Further than this, the necessity for segregation was lessened by the fact that the pieces were all marked "Kaiser Art Company," and that signs bearing the name "Kaiser Art China" were displayed on or near the same.

I do not attach much importance to the statement of petitioner that she desired to protect herself. It seems to me that this would be a natural and truthful statement for petitioner to make. Resort to a consignment contract was consistent for the purpose of protection, where it appears that there was no obligation on the part of the consignee to pay for any goods not sold, and where the consignor had agreed to keep the consignee stocked with a complete line of her wares.

While it is true that the record does not show expressly that petitioner reserved the right to sell any of the goods consigned, nevertheless there is nothing to show that she did not have that right. As I view the case, there was nothing to prevent either of these parties from terminating this contract, and returning or requiring the return of the merchandise not sold, at any time. Perhaps, as a condition to petitioner's requiring the return of the goods not sold, bankrupt would be entitled to repayment of the freight paid thereon, or other proper disbursements made in reliance upon the agreement. It seems quite plain that petitioner could have changed the goods in the hands of bankrupt at any time; but I do not consider that necessary to be decided in this matter. The agreement was lived up to almost in every particular, and the fact that no accounting was rendered for the month of July is not so important, when it is considered that the affairs of the bankrupt could not have been in a very good condition at that time, as the involuntary petition in bankruptcy was filed on August 21, 1913.

It cannot be said that these goods were placed with the bankrupt for "resale." The arrangement plainly shows that there was never any intention of having the title pass to bankrupt; the intention being to place the goods in the hands of bankrupt for "sale" by the bankrupt as consignee, the title to the goods passing direct from the petitioner to the purchaser. It is true that no right was expressly retained by

petitioner in the proceeds of the goods sold, nor was it expressly agreed that the identical proceeds were to be accounted for. It is held in the John Deere Plow Company Case that this fact was not controlling. While the proceeds of these sales were mixed with the bankrupt's funds, slips were kept of all goods sold for the purpose of making the accounting, and as a matter of bookkeeping the funds were not mixed.

The only remaining question is whether the trusteee in bankruptcy herein has rights in the goods superior to those of the petitioner. It is urged that the amendment of 1910 above referred to gives the trustee title to these goods. I conclude from the language of our Court of Appeals in the Mishawaka Case, and in the John Deere Plow Company Case, that if these goods were placed on consignment and belonged to petitioner, the trustee would not take title thereto. This point was passed upon in Re Wright-Dana Hardware Company, 211 Fed. 908, 128 C. C. A. 286, 31 Am. Bankr. Rep. 764 (C. C. A. Second Circuit, 1914), affirming (D. C.) 205 Fed. 335, 30 Am. Bankr. Rep. 583, wherein it was said (in referring to Bankr. Act, § 70 [Comp. St. 1913, § 9654], construed with the amendment to section 47 [section 9631]):

"We do not, however, understand that this clause includes or was intended to include property in the hands of a bankrupt bailee or of a bankrupt agent, who never had the title, but who may have had a right to sell the property for the benefit of his bailor or principal. It is impossible to give the act any such construction. The bailor cannot thus be divested of his title."

An order should be entered that the trustee deliver to petitioner all Kaiser Art China now on hand, and that there should be paid to petitioner the proceeds of any of petitioner's china sold by the receiver, and an accounting should be had as to the china sold by the bankrupt prior to the filing of the petition in bankruptcy, and not accounted for, so that petitioner might participate to that extent as an unsecured creditor therefor. For the guidance of counsel in other matters lately decided by me and by the referee, I do not wish to be understood as overruling any of the previous decisions in this district on other facts. This case is decided upon the peculiar facts involved herein.