**TEXAS FARM PRODUCTS COMPANY,**
Appellant,

v.

**BURRUS FEED MILLS, INC., d/b/a Burrus Feed Mills, Appellee.**

No. 15661.

Court of Civil Appeals of Texas.

Dallas.

June 3, 1960.

Rehearing Denied July 1, 1960.

S. M. Adams, Jr., Nacogdoches, for appellant.

Matthews & Sligh, Dallas, for appellee.

DIXON, Chief Justice.

Appellant Texas Farm Products Company, a corporation, has appealed from a judgment holding that a chattel mortgage lien owned by appellee Burrus Feed Mills, Inc., on a flock of chickens is prior and superior to a chattel mortgage lien claimed by appellant.

On March 16, 1957 William A. Purgahn, of San Augustine County, Texas, purchased two thousand "Day Old Trapnest Pullets" from Ward's Feed Store for a consideration of $720. The purchase was financed by appellee Burrus Feed Mills. In payment Purgahn executed his purchase price note and chattel mortgage to Ward's Feed Store, which note and mortgage were transferred to appellee and filed for record in San Augustine County, Texas, on the day of the purchase, March 26, 1957. Thereafter Purgahn made twenty-five purchases of feed, which purchases were also financed by appellee and for which Purgahn signed purchase notes, thereby running up the principal amount of his in-

debtedness to appellee to about $2,900. After allowing credits there was about $2,284 due at the time of trial.

The chattel mortgage executed by Purgahn contains this description of the property mortgaged:

"All of the chickens, and the increase thereof, owned by the mortgagor or which may hereafter during the existence of the indebtedness be owned by the mortgagor, said chickens being located or to be located on the farm, commonly known as the Purgahn Farm located 13 miles South from the town of San Augustine, on F M—705 in the County of San Augustine, State of Texas, which farm is more fully described as follows: 150 acres Farm Land."

Subsequently, some time in the early part of 1958, Purgahn bought three thousand "Babcock Bessie Pullets" from DeWitt Hatcheries in Nacogdoches, Texas, executing an unsecured note for the purchase price. Thereafter, in order to obtain feed, he executed a note and mortgage in the amount of $6,000, payable April 15, 1959 to appellant Texas Farm Products Company. This mortgage contains the following description of the property in question:

"3,000 Babcock Bessie Pullets to be paid for under condition 1 as described in Laying Flock Agreement dated April 15, 1958".

At the time he executed the $6,000 note and mortgage Purgahn was not indebted to appellant in any amount. The note was to cover future purchases of feed, which at the time of trial amounted to about $900.

Meantime Purgahn had quit paying on his indebtedness to appellee Burrus Feed Mills. Appellee's credit man visited the Purgahn farm in June 1958, having heard that Purgahn had acquired additional chickens. The additional chickens at that time were about eight weeks old.

Soon thereafter appellee filed suit against Purgahn for $2,899.91 including interest and attorney's fees, and against Purgahn, Texas Farm Products Company and Bobby Hedricks for foreclosure of its chattel mortgage lien against both flocks of chickens. Bobby Hedricks came into the picture in this manner: immediately after citation was served appellant Texas Farm Products Company caused the three thousand "Babcock Bessie Pullets" to be picked up and transferred from Purgahn's farm to the farm of Bobby Hedricks in Nacogdoches County.

Later a receiver was appointed, the chickens were sold, and the money from the sale is now being held in the treasury of the court.

The trial court rendered judgment in favor of plaintiff Burrus Feed Mills against Purgahn for $2,956.19, and against all defendants for foreclosure of its chattel mortgage lien on all of the chickens. The judgment also provides that the money held in court should be first applied to payment of Purgahn's indebtedness to Burris Feed Mills.

## Opinion.

In its only point on appeal appellant Texas Farm Products Company says that appellee's chattel mortgage is not sufficiently definite to fix a lien on the second flock of chickens.

It will be observed that appellee's chattel mortgage provides that the lien shall cover the flock of chickens then owned by Purgahn and also chickens "which may hereafter during the existence of the indebtedness be owned by the mortgagor". Appellant argues that the latter provision in appellee's mortgage is too indefinite to be effective as a mortgage on after-acquired property, such as the three thousand pullets on which both appellant and appellee claim liens. In support of its contention appellant relies on the holdings in Richardson v. Washington et al., 88 Tex. 339, 31 S.W. 614; McDavid v. Phillips, 100 Tex. 73, 94 S.W. 1131; and Watson v. D. A. Paddleford & Son, 110 Tex. 525, 221 S.W. 569.

Appellee also cites Richardson v. Washington, supra, contending that the terms of

its mortgage together with other undisputed facts in this case are in conformity with the holding in the Richardson case. In addition appellee cites us to Speer v. Allen, Tex.Civ.App., 135 S.W. 231; First Nat. Bank of Fabens v. American Trust & Savings Bank of El Paso, Tex.Civ.App., 1 S.W.2d 437; and Barron v. San Angelo Nat. Bank, Tex.Civ.App., 138 S.W.142.

In the Richardson v. Washington case, supra, it was held that a mortgage upon personal property not owned by the mortgagor at the date of the mortgage is void unless, after acquiring the property, the mortgagor performs some act indicating a purpose to bring it within the terms of the mortgage. On the other hand equity will enforce the mortgage if it is clear, considering the surrounding circumstances at the time of the transaction, that the parties intended that the lien should be fixed on the after-acquired property.

The location and ownership of the land where the property is located, or is to be located is also sometimes very important, especially if the property is itself of a kind difficult to describe with such accuracy as might set it apart from property of a similar kind. Richardson v. Washington, supra; 14 C.J.S. Chattel Mortgages § 64, p. 671. See also cases hereinbefore cited.

The McDavid case reiterates the holding in the Washington case, but is not in point with the facts in the instant case. The chattel mortgage covered crops to be raised anywhere in Smith County, or anywhere in the world for that matter. Such a description is too indefinite. The later crop raised by the mortgagor in the McDavid case was grown on land other than the described farm.

The Watson case also cited by appellant is not in point either. The chattel mortgage covered any three bales of cotton in Coleman County. There was nothing in the mortgage to point out any particular cotton located on any particular land.

It is our opinion that appellee's mortgage is a valid lien on the after-acquired chickens involved in this controversy, and that its mortgage is prior and superior to that of appellant.

In South Texas Implement & Machine Co. v. Anahuac Canal Co., Tex.Com. App., 280 S.W. 521, it is said that the intention and contemplation of the parties is to be determined from the instrument itself. Applying that rule we believe that the test is met in this case by the express terms of the instrument executed by Purgahn, together with the subsequent act of Purgahn in placing additional chickens on the very farm described in the mortgage.

However if we be mistaken in the foregoing conclusion, we believe that the judgment of the trial court must be affirmed for other reasons. The description of the land where the property was to be located is adequately described in appellee's mortgage. Appellant's claimed mortgage is fatally defective in that particular. It simply refers to three thousand babcock bessie pullets which are to be paid for according to a certain plan. It does not describe the location of the chickens. Under the cases cited by appellant such a broad description without any reference to the land where the chickens are to be found is not sufficient to give appellant a valid lien superior to the lien of appellee.

The South Texas Implement & Machine Company case, as we have pointed out, says that the intention of the parties is to be determined from the instrument itself. But the opinion on page 523 says that cases may arise and do arise where parol evidence may be shown to aid the mortgage though not to destroy it.

Any doubt about the intentions of the parties when they executed appellee's mortgage must disappear in the face of the undisputed testimony in aid of the mortgage. G. H. Thompson, co-ordinator of appellant's retail stores in their dealings with the main office, was called by appellee as an

adverse witness. Without objection Thompson testified as follows:

"Q. All right, what do you mean by laying accounts? A. Well, any laying account that we have producing hatcheries, hatchery eggs or commercial eggs.

"Q. All right, will you explain how that laying account operates, Mr. Thompson? A. Well, will you clarify that a little bit?

"Q. Yes. How does a farmer with a laying account operate, does he just buy one group of chickens, what happens? A. Normally a farmer with a laying flock of chickens, he will put down baby chicks, raise them into layers, go through the laying period and somewhere during that time he will put down replacements for them, to replace when the original flock goes out of production.

"Q. I understand you to say that a farmer starting off with a laying flock will buy a group of pullets? A. Or maybe chicks.

"Q. To be raised until they are layers, and about how long is the life, the productive life of a laying hen? A. Oh, approximately twelve months after they go into production.

"Q. After they go into production? A. That's right.

"Q. Then during that period of time before the original group grows out of production he buys another group of baby chicks to have ready for production when the older ones quit laying, is that right? A. That's right.

"Q. Is that the way it operates? It is a continuing process? A. Right. * * *

"Q. Now, back to this laying flock program, that you say the farmers go through—was that the type of program that Mr. Purgahn had? A. To my knowledge it was, yes.

"Q. In other words, at the time that he bought this second three thousand Babcock Bessie chicks, he had other chickens that were just beginning to lay? A. Yes, Sir.

"Q. And these were bought for replacement of those? A. To my knowledge that is right."

Thompson's testimony indicates that when Purgahn bought the two thousand trapnest pullets on March 26, 1957, it was contemplated that Purgahn would follow the procedure described by Thompson and would later place additional chickens on his farm and that these chickens under the express terms of the mortgage would also be subject to appellee's mortgage.

The judgment of the trial court is affirmed.

CRAMER, J., not sitting.