Leon W. FOWLER, Trustee in Bankruptcy, in the matter of Jeff Martin, Jr., d/b/a Martin's DX, Manly's Associates, Manly's and Martin's Tire & Appliance, Appellant,

v.

PENNSYLVANIA TIRE COMPANY, Appellee.

No. 20417.

United States Court of Appeals Fifth Circuit.

Jan. 10, 1964.

John R. Brown, Circuit Judge, dissented.

Leon W. Fowler, Tyler, Tex., for appellant.

LeRoy Neal, Gladewater, Tex., Shirley W. Peters, Denton, Tex., for appellee.

Before HUTCHESON and BROWN, Circuit Judges, and SIMPSON, District Judge.

SIMPSON, District Judge.

This is an appeal by the trustee in bankruptcy from a judgment [1] of the District Court reversing an Order [2] of the referee in bankruptcy denying the peti-

1. The Court's Judgment:

"The Petition for Review filed herein by Pennsylvania Tire Company, an Ohio corporation with its principal place of business at Maysville, Ohio, having been presented to me, Judge of the District Court of the United States for the Eastern District of Texas, Tyler Division, and the same, as well as the proceedings had before the Referee certified to the Court, together with the briefs of counsel, having been considered by me, and after having given due deliberation to the same, the Court finds and concludes that the 'POC' Warehouse Agreement entered into on the 27th day of May, 1960, between Martin Tire and Appliance Co. and Pennsylvania Tire Company was an agreement for the consignment of tires by Pennsylvania Tire Company to Martin Tire & Appliance Co.; that Pennsylvania Tire Company had title to the tires it shipped to Martin Tire & Appliance Company under said contract that were on hand at the time of the institution of this bankruptcy proceeding; that the conclusion of law of the Referee to the effect that the tires shipped by Pennsylvania Tire Company were sold to Martin Tire & Appliance Co. is erroneous; that the Order of the Referee denying the Petition for Reclamation of Pennsylvania Tire Company was erroneous:

"It is ACCORDINGLY ORDERED, ADJUDGED AND DECREED:

"(a) That the petition for review by Pennsylvania Tire Company from the order of the Referee, dated August 8, 1962, be and the same is hereby granted.

"(b) That the title to the tires on hand at the institution of this proceedings in bankruptcy, shipped to Martin Tire & Appliance Co. under said contract, is in Pennsylvania Tire Company.

"(c) That the order of the Referee dated August 8, 1962 denying the reclamation petition of Pennsylvania Tire Company be and the same is hereby vacated and set aside.

"(d) That this cause be and the same is hereby remanded to the Referee for the entry of an appropriate order on the petition for reclamation by Pennsylvania Tire Company.

"(e) That the Clerk serve a copy of this order upon the Referee and the Trustee; that all costs of this review be adjudged against the Trustee.

"This Order approved, signed, entered and ordered filed this the 8th day of December, 1962, at Tyler, Texas.

"JOE W. SHEEHY,
Judge, District Court of the United States Eastern District of Texas, Tyler Division."

2. The Referee's Order:

"Findings of Fact:

"(1) That on April 17, 1962 Jeff Martin, Jr. d/b/a Martin's Tire & Appliance, filed a voluntary petition in bank-

tion for reclamation as filed by the appellee, Pennsylvania Tire Company. The question for decision is whether the agreement by which the appellee delivered its tires to the appellant-bankrupt for resale was a consignment for sale or an absolute sale with a right of return.

ruptcy and on May 1, 1962, Leon W. Fowler qualified as Trustee of said estate.

"(2) That on the 27th day of May, 1960, the bankrupt and the Pennsylvania Tire Company entered into an agreement called 'POC Warehouse Agreement'.

"(3) That the said POC Warehouse Agreement was not recorded in Texas, nor in the State of Ohio, the law of which latter State the parties agreed to be controlling in construing the said Agreement.

"(4) That no signs were posted as provided for in the Agreement in the bankrupt's place of business which disclosed a relationship between the petitioner Pennsylvania Tire Company and the bankrupt other than being one of a sale to the sale bankrupt.

"(5) That the tires were not segregated or kept in a separate place from the rest of the merchandise of the bankrupt in accordance with said Agreement.

"(6) That the bankrupt made out the orders for tires which he desired to be shipped to him rather than the company selecting the tires for shipment, and that the tires which were shipped to Martin were for the purpose of resale and that there were no restrictions on the amount of tires the bankrupt could sell or as to the terms of such sale.

"(7) That from the inception of the transactions between the bankrupt and the Pennsylvania Tire Company the overwhelming majority of transfer papers showing the type of tires shipped to the bankrupt were stamped by the Company with a stamp indicating that credit had been approved on a certain date and the initial of the approving officer.

"(8) That the copies of the 'Customer Invoice File' indicated that the tires were 'sold to Martin Tire & Appliance Co., 105 West Commerce St., Gladewater, Texas', and that the tires were 'shipped to Same'.

"(9) That no tires could be returned to the Company or transferred to other Company distributors without prior express authority of the Pennsylvania Tire Company.

"Conclusions of Law:

"That the business transactions between the Pennsylvania Tire Company

On May 27, 1960, Pennsylvania Tire Company and Jeff Martin, Jr. d/b/a Martin's DX, Manly's Associates, Manly's and Martin's Tire & Appliance Co., (hereinafter referred to as Bankrupt), entered into a contract,[3] whereby the former agreed to deliver tires to the latter for

and Jeff Martin, Jr., d/b/a Martin Tire & Appliance amounted to a sale, and that the said Jeff Martin was obligated to pay for tires that were shipped to him by the said Pennsylvania Tire Company.

"It is therefore Ordered and Decreed that the Petition for Reclamation of the Pennsylvania Tire Company be and the same hereby is Denied, and that the title to such tires is placed in the Trustee in Bankruptcy.

"Joe D. Huffstutler,
Referee in Bankruptcy."

3. Pertinent provisions of the contract are:
"TITLE: Title in and to all such stock shall be and remain in Company until disposed of by the Warehouseman in accordance with the provisions hereinafter outlined. The Warehouseman agrees to take all necessary steps to protect and maintain the Company's title in and to such merchandise; to keep such merchandise separate and apart from similar merchandise owned by persons other than the Company; to not permit same to be mingled with any other merchandise; to at all times maintain appropriate signs, labels or other identification clearly designating same as Company's property.

"INVENTORY REPORTS: The Warehouseman shall forward to the Company at Mansfield, Ohio, immediately after the end of each month an actual physical inventory indicating the quantity, size and type of such consigned stock at the beginning and end of the month and a list of transfers to and from such stock. All reports are to be prepared on such forms as the Company may provide. Acknowledgment receipts of all consigned stock received shall be furnished daily. Warehouseman further agrees to maintain such records to make such further and additional reports which the Company may deem necessary from time to time in regard to the consigned stock.

"ACCESS TO STOCK: The Company shall have access to the consigned stock at all times, whether during or after business hours.

"WITHDRAWAL REPORTS: When stock is withdrawn from warehouse stock, invoices or reports on forms furnished by the Company must be issued daily, all copies of which must be mailed ei-

resale at prices and terms fixed by the latter. This contract was termed a con-

signment with the title expressly being reserved with the appellee. While

ther to Mansfield, Ohio, or the Division Office, as Mansfield may direct through the Warehouse Manual of Instruction in effect from time to time. Withdrawal reports issued by Warehouseman shall not be valid until accepted by Company, however, all such reports received by Company shall be deemed to have been accepted unless Company notifies Warehouseman to the contrary within 30 days from their receipt.

"TRUST ACCOUNT: On or before the 10th day of each month, Warehouseman will pay to Company, in addition to any other payments, in trust, the sum of $ TRUST FUND WAIVERED for the following purposes:

"(a) If, during this agreement, such trust fund, after application to delinquencies, equals or exceeds Warehouseman's cost of the then consigned stock, Company shall sell and the Warehouseman shall buy such stock, payment to be made by application of sufficient trust funds.

"(b) Company may apply at any time or times all or any part of such trust funds to liquidate any delinquencies in Warehouseman's indebtedness.

"(c) Upon any termination of this agreement, Company shall apply such trust fund upon Warehouseman's indebtedness, delinquent or not, and at its option either return the excess, if any, or retain same as the purchase price of an appropriate amount of consigned stock.

"FIRE INSURANCE: The Company agrees to carry adequate insurance against loss by fire of all merchandise carried in the Warehouse stock, cost of said insurance to be paid to the Company by Warehouseman promptly after receipt of billing.

"TAXES: The Warehouseman will, where and when required, list the stock for taxation in his own name as bailee, showing the merchandise as stock held on consignment. The Warehouseman will pay to the proper authority, as they become due, all taxes or fees on such stock, or by reason of having or selling the stock, or upon billing at any time from Company at the latest available rate, will make such payment to Company, who will then be responsible to the taxing authority. The Warehouseman will furnish Company copies of tax returns and receipts covering such property. Warehouseman will secure and maintain all licenses at his own expense.

"RETURNED GOODS: Except for the provisions as outlined under 'Ter-

mination' as set forth below, the following procedure will apply to returned goods:

"1) Any merchandise withdrawn by Warehouseman for his own account shall not thereafter be returned to the consigned stock without prior written approval from the Company.

"2) Merchandise which does not reflect the proper turnover within a 60 day period, may at the option of the Company be ordered for:
   "(a) Return to the Company's Division, or,
   "(b) Authorized for shipment to other Distributors.

"3) Warehouseman may request permission from Company to return any merchandise which he may consider over stock for his market.

"Warehouseman agrees in the case of 2) and 3) above and on receipt of Company's instructions, to ship the material freight prepaid.

"TERMINATION: Breach of this agreement by either party will be considered just cause for immediate termination. This agreement may also be cancelled by either party at any time upon three days' written notice. In either event, Warehouseman agrees to deliver immediately thereafter to location designated by Company and without expense or commission of any nature to Company, all consigned stock in his possession.

"In the event this agreement is terminated either because of Warehouseman's failure to keep and perform any of the terms and conditions of this agreement (breach of contract) or because Warehouseman elects to terminate of his own volition, then Warehouseman agrees to return the consigned stock transportation charges prepaid and to pay to the Company a sum equal to two and one half per cent (2½%) of the value of the consigned stock returned, computed at Warehouseman's buying price in effect on date of termination. It is understood and agreed by Warehouseman that the 2½% is to compensate Company for partial cost of the handling and transportation incidental with placing the merchandise in Warehouseman's place of business.

"The Warehouseman also agrees that in case of cancellation or termination of this contract, the Company may enter if necessary, Warehouseman's or other premises and take, remove and repossess said consigned stock without hindrance or molestation on the part of Warehouse-

monthly inventory reports were required, there was no provision for any sort of segregating or earmarking of these tires.

■ On April 17, 1962, bankrupt filed a voluntary petition in bankruptcy, and on the following day, an order of adjudication was entered. On May 1st, Pennsylvania filed its petition for reclamation of these tires still in bankrupt's possession, asserting that this transaction was a consignment, and therefore, the title to the tires did not pass to the bankrupt and consequently could not pass to the trustee under Sec. 70, sub. c of The Bankruptcy Act (Title 11 U.S.C. § 110, sub. c).[4] The outcome of this litigation depends on a determination of who had title to these tires. In addition to the express reservation of title in the contract, it is necessary for the Court to examine the transaction and, if possible, to ascertain the correct intent of the parties. Texas Farm Products Co. v. Burus Feed Mills, Inc., (C.A.Tex.), 337 S.W.2d 203; Garrett et al. v. International Milling Co., (C.A.Tex.), 223 S.W. 2d 67.

■ First of all, the appellant contends that this agreement amounted to a sale and not a consignment and secondly, that if this was not an absolute sale, then it was at least a conditional sales contract. In support of this second contention, the appellant claims that the parties agreed to be bound by Ohio law, and Ohio law declares that conditional sales contracts are void as to subsequent creditors, unless they are properly recorded. The trustee claims to be in the

man, who hereby waives all right or claims.

"Waiver of any of the terms or conditions of the agreement by the Company shall not be construed to establish a precedent."

4. 11 U.S.C. § 110, sub. c provides as follows: "The trustee may have the benefit of all defenses available to the bankrupt as against third persons, including statutes of limitation, statutes of frauds, usury, and other personal defenses; and

shoes of a subsequent creditor by virtue of Sec. 70, sub. c, which position we agree with. However, we hold that this agreement created a consignment, and not a sale, so it is not necessary to discuss recordation under Ohio law.

Since this is a bankruptcy case in which the laws of both Texas and Ohio are relied on by the parties, it seems appropriate to discuss briefly the law that is applicable in order that the resulting confusion be obviated. Such a problem poses two questions. Whether the law of one state should control as opposed to that of another state, and whether the Bankruptcy Act should override the state law of the state in which the Court sits?

■ In the absence of a conflict between the state and bankruptcy laws, the former governs as to questions pertaining to the title to property and to related problems such as defining the nature of a particular transaction. Arnold v. Phillips, 5 Cir., 117 F.2d 497, cert. den. 313 U.S. 583, 61 S.Ct. 1102, 85 L.Ed. 1539; Jaffke v. Dunham, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314; Whitehouse Bros. v. Abbott & Son, (C.A.Tex.) 228 S.W. 599. In the case of In re Tansill, 4 Cir., 17 F.2d 413 at 415, the Court said:

"The nature of the transaction, that is to say, whether for instance, it amounts to a sale or bailment or pledge or mortgage or some other transfer of property, or whether sufficient delivery has been made to pass title, or whether recording or filing of an instrument, be required, and, if so, as to whom it will be void for lack of recording, etc., is to be

a waiver of any such defense by the bankrupt after bankruptcy shall not bind the trustee. The trustee, as to all property, whether or not coming into possession or control of the court, upon which a creditor of the bankrupt could have obtained a lien by legal or equitable proceedings at the date of bankruptcy, shall be deemed vested as of such date with all the rights, remedies, and powers of a creditor then holding a lien thereon by such proceedings, whether or not such a creditor actually exists."

determined by the state law, and the bankruptcy court will take it as so determined."

As to which state law applies, Kansas City Title Ins. Co. v. Butler (C.A. Tex.), 265 S.W.2d 154, held that in the absence of some specific pleading or invocation of Texas Rules of Civil Procedure, rule 184a, it will be presumed that the law of another state is similar to the law of Texas. In Frederick v. Burg, 148 F.Supp. 673, (W.D.Pa.), plaintiffs brought a damage suit in the Western District of Pennsylvania for injury to their land located in Ohio. When concerned with which state law to apply, the Court stated:

"Inasmuch as plaintiffs have been unable to cite any Ohio law or cases to support their position, and in fact no cases from any jurisdiction in support of their position, this Court will assume that the law of Ohio is the same as the law of Pennsylvania, the state in which this Court is sitting."

In the case at bar, appellants have failed to cite any cases or statutory law of Ohio which would necessitate a different result than arrived at under Texas law. Texas has a statutory provision for the recording of conditional sales contracts,[5] but there is no corresponding requirement that consignments be likewise recorded. Therefore, it will be presumed that the law of Ohio does not require recording of consignment contracts, and consequently, it becomes immaterial which state law is applicable.

Turning to the controlling issue in this case of whether the transaction was a consignment for sale or a sale with the right of return, the trustee persistently contends that nowithstanding the express language in the contract—that the title is reserved with Pennsylvania Tire Company—the agreement is a sale with the right to return any of the tires which the bankrupt does not sell. The basis for this contention is that subsequent to the contract, the actions of the parties indicated that they were treating the tires as belonging outright to the bankrupt. The trustee takes the position that the conduct of the parties finally determines the position of the parties with reference to their intentions, citing Goodyear Tire & Rubber Co. v. Orebaugh, 6 Cir., 79 F.2d 738, to support his argument. But the facts there are distinguishable, which difference results in the application of another principle of law. In the above case, the manufacturer sold tires to the bankrupt, and having some doubt as to the latter's financial ability, attempted to take back title through the issuance of credit memoranda. The bankrupt never gave up possession of the tires and failed to earmark them as the property of Goodyear. The Court held that as to third parties, the transaction was ineffective to divest the bankrupt of his title to the tires. In the instant case, title never passed to the bankrupt by the terms of the agreement, so there is no need to decide whether there occurred sufficient later acts to divest the bankrupt of his title. There is language in the case of Matter of Klein, 2 Cir., 3 F.2d 375, to the effect that a test of the good faith of an agreement purporting to be a consignment for sale is to ascertain whether the parties adhered to the agreement and performed its terms or ignored it and, in violation of its terms, treated deliveries of goods as actual sales. The force of this language relates to discovering the intentions of the parties as to whether they actually intended to effect a consignment or whether the arrangement was only a cloak intended to conceal an actual sale. There is no question here of any bad faith or collusive dealings between the parties which could result in detriment to third parties.

As to determining the intent of the parties, the prevailing view is that

---

5. Under Texas law, a conditional sales contract is treated as a mortgage. Cardwell Inv. Co. v. United Supply & Mfg. Co., 10 Cir., 268 F.2d 857. Consequent- ly, its recording is governed by the statute governing mortgages. 16 Vernon's Texas Statutes, Art. 5490.

it will be determined solely by the words employed in the written instrument, where the meaning of such instrument is clear and unambiguous. Garrett et al v. International Milling Co., (C.A.Tex.), 223 S.W.2d 67; Edgewood Shoe Factories, Division of General Shoe Corp. v. Stewart, 5 Cir., 107 F.2d 123; Samson Tire & Rubber Co. v. Eggleston, 5 Cir., 45 F.2d 502. But where the contract or agreement is unclear or of doubtful meaning, the Court in interpreting what the parties were called upon to do, may properly consider acts done by the parties in the course of performance. Ross & Sensibaugh v. McLelland, (C.A.Tex.), 262 S.W. 2d 205 reh. den.; Samson Tire & Rubber Co. v. Eggleston, supra. The foundation for this latter principle is that a person's construction of his own language constitutes the highest evidence of his intentions. However, this rule is applicable only if the contract is ambiguous or of doubtful meaning; it does not apply to any agreement that is free of ambiguity. See generally, 13 Tex.Jur.2d, Contracts § 128.

■ Here the terms used and their meaning are clear. The agreement is complete and no dispute is present as to the meaning of any language used.

■ The prime distinguishing factor of a consignment as opposed to a sale is that after the goods have been delivered to the dealer, no obligation arises on the part of the dealer to pay for them. In the case of Edgewood Shoe Factories, supra, a petition for reclamation was filed with the trustee in bankruptcy. In the opinion which held that the petition for reclamation should have been granted, Judge Hutcheson said:

"All agree then, that if out of the agreement itself alone, if clear and unambiguous, or out of the acts and agreements of the parties, if the agreement is of doubtful purport, there arises an obligation on the part of the apparent consignee to buy and pay for the delivered goods, such that a suit can be maintained by the consignor as creditor, the transaction is one of sale, or agreement to sell, and not of consignment for sale. Whereas, if no binding obligation to buy or pay for the goods, on which consignor could sue, arises out of the agreement alone, or out of the agreement taken with the facts, but only an obligation to account to the consignor for the proceeds of the goods when sold, the relation must be held to be, not one of buyer and seller, but one of consignor and consignee for sale."

In the instant case, neither in the written agreement nor in the facts can there be found any reason to support a claim that the bankrupt was or could be obligated, at any time, to buy or pay for any unsold tires. In the same opinion, it was stated:

"The only obligation upon the consignee, as disclosed, by the plain and unambiguous terms of the contract and confirmed by the facts, was to turn over to the consignor, up to the invoice price, the proceeds of sales of the shoes made for it by the consignee."

Ludvigh v. American Woolen Co., 231 U.S. 522, 34 S.Ct. 161, 50 L.Ed. 345; In re Thomas, 231 F. 512 (S.D.Ga.); In re National Home & Hotel Supply Co., 226 F. 840 (E.D.Mich.); Whitehouse Bros. v. Abbott & Son (C.A.Tex.), 228 S.W. 599.

■ The Edgewood decision is in line with the weight of authority elsewhere. Even if it was not, it would bind us under the doctrine of stare decisis.

The judgment of the District Court was correct; it is

Affirmed.

JOHN R. BROWN, Circuit Judge (dissenting).

I agree that ultimately "[t]he outcome of this litigation depends on a determination of who had title to these tires," that is, whether the tires were the property of the bankrupt. I also agree that a different result obtains depending on whether the legal relation between the bankrupt and the Pennsylvania Tire Company is that of buyer and seller or consignee and

consignor. I cannot agree, however, that in attempting to discover the nature of the relationship we are confined to the 4 corners of the instrument called "POC" Warehouse Agreement. Nor do I think that much is gained in discussing the case in terms of "title" or "consignment" versus "sale." These are not a statement of the reasons *why*. They are, rather, a statement of the problem, or, once it is decided, a statement of the conclusion. Because the broader inquiry which I believe is required yields a conclusion different from that reached by the majority, I respectfully dissent.

As I see it, whether title passed to the bankrupt on delivery of the tires or remained in the Tire Company until the tires were sold to a third-party user-customer depends on the agreement between the bankrupt and the Tire Company as evidenced by both the written "POC" Warehouse Agreement and the long-continued course of dealing. Admittedly several provisions of the Warehouse Agreement are consistent with a relationship of consignee and consignor. But the hard facts are that the bankrupt and the Tire Company did not operate in the manner called for by the Agreement.

The Agreement called for the bankrupt to keep the "merchandise separate and apart from similar merchandise owned by persons other than the [Tire] Company;" to make sure that the merchandise covered by the Agreement was not "mingled with any other merchandise;" and "to at all times maintain appropriate signs, labels or other identification clearly designating same as [Tire] Company's property." These requirements simply were not met by the bankrupt. He kept one common stock of tires on display for sale. Various other brands of tires were mixed with the Pennsylvania tires whose

title is here in dispute. No signs or labels were maintained either on the premises or on the Pennsylvania tires which indicated that they were the property of the Tire Company rather than property of the bankrupt.

The Agreement required the bankrupt to forward to the Tire Company "immediately after the end of each month an actual physical inventory indicating the quantity, size and type of such consigned stock at the beginning and end of the month and a list of transfers to and from such stock." Acknowledgment receipts of all consigned stock received were required to "be furnished daily." Finally, the bankrupt was required to "render detailed reports daily reflecting the total amount of merchandise * * * withdrawn from the consigned stock." These reports were not made. The evidence is that the practice was for the bankrupt to fill out a statement of sale whenever, in his opinion, a sufficient number of tires had been sold to justify the making of a report.

Although it is apparent from the face of the Agreement that the Tire Company was attempting to set up an arrangement whereby the bankrupt would act as the agent of the Tire Company for the purposes of delivering merchandise to user-customers and collecting sales proceeds in trust for subsequent transmission to the Tire Company,[1] other provisions of the Agreement and certainly the course of dealing between the parties were inconsistent with an arrangement of this type. Under the Agreement, the bankrupt was responsible for any shortage in the stock whether caused by negligence, theft, fire [2] or otherwise. The bankrupt was likewise liable ultimately for all taxes on the stock.[3] In return for assuming all the risk of loss and for performing the stor-

1. Presumably this duty would require the bankrupt to segregate the sales proceeds in a trust account in the bank separate from his general bank account.

2. The agreement provided that the Tire Company would purchase fire insurance on the stock. The premium was to be paid ultimately by the bankrupt, however,

and in actual practice the bankrupt carried its own fire insurance payable to its order.

3. Under the terms of the agreement, all taxes whether initially paid by the Tire Company or by the bankrupt were to be paid ultimately by the bankrupt. Although the agreement provided for seg-

**534**

age and selling function for the Tire Company one would assume that the bankrupt would be allowed some compensation. He was, but it was measured—under the agreement—just as the compensation of retailers is universally measured. The bankrupt was allowed to retain an amount equal to the retail price of tires sold minus the wholesale price. Out of this amount the bankrupt was to pay the service charge of 1 and ½ per cent per month on the wholesale value of the tires not yet sold. This obviously was a charge for the financing of inventory. I need not determine the legal consequences of such arrangements if put into actual operation. The fact is that the bankrupt and the Tire Company never operated in the manner outlined. The tires were invoiced as "Sold To Martin Tire & Appliance, 105 Commerce, Gladewater, Texas," and the Tire Company charged Accounts Receivable when the tires were shipped. As noted above, the tires were not segregated, and the receipt and withdrawal reports were not made. The bankrupt dealt with the public as though the tires were his. He sold tires at prices and terms of his sole discretion. Rather than segregating the sales proceeds in trust in a bank account separate from his general bank account as apparently called for by the agreement,[4] he deposited the receipts in his general bank account. When he made remittances, either in payment of amounts billed on the tires or in payment of the "service charge," he drew a check on his general account. Even the service charge was computed in a manner different from that provided in the agreement. Rather than being computed on the balance of inventory unsold and on hand, it was computed on the total value of tires shipped to the bankrupt during the month, whether sold or not. Finally, both under the contract

and in actual practice, the bankrupt could return tires only with the consent of the Tire Company. In short, the relationship in actual practice had every earmark of that of buyer and seller, with inventory financing aid being supplied by the seller, Pennsylvania Tire Company.

I have not set forth this detail with the thought in mind that this alters or varies the terms of the written contract. We do not have that case before us. Whatever the legal consequences of its terms might be if adhered to, the fact is that neither party complied with them. Assuming it controlled absolutely the initial "consignment" of tires, the contract, if ignored as it was throughout all subsequent times, could not extinguish either the fact of actual conduct or the legal significance of it. Moreover, these actual operations in disregard or violation of the terms of the agreement were not concealed, unilateral, unknown actions. The Tire Company made regular inspections and frequent reports of these derelictions were made to the home office. Nevertheless the home office continued to ship and invoice tires to the bankrupt knowing that what the contract prescribed would never be complied with.

In that situation the legal relationship of the parties and to the merchandise should be determined by what was done, not by what they said they would do.

The consequences of this decision in terms of the Texas policy of protecting creditors is ominous. In the first place any contract couched in terms of a conditional sale or other reservation of title are expressly treated by Texas as a chattel mortgage requiring recordation to be valid against creditors. Tex.Civ.Stat. Ann. arts. 5489, 5490 (Vernon 1958).

regation of the Pennsylvania tires for taxing purposes and detailed reporting in the form of tax returns and receipts concerning the Pennsylvania tires, the practice was for the bankrupt to render and pay taxes on all the stock as though it were all his. No renditions, assessments, or returns or receipts indicating

taxes paid on Pennsylvania tires were sent to the Tire Company because such tires were simply not rendered or assessed for taxation, and the taxes were not paid in a manner that would make this possible.

4. See note 1, supra and accompanying text.

Next, in the various arrangements essential to the flow of credit for commercial operations, such as advances by factors,[5] assignment of accounts receivable,[6] or the like, Texas prescribes elaborate and exacting provisions for notice and recordation. And where financing is to be done through trust receipts, field warehousing or the like, it is essential that the dealer not have the legal possession of the merchandise. Over 30 years ago in a Texas bankruptcy case, this Court held that under a typical tripartite trust agreement possession of the automobiles by the dealer made the arrangement essentially a chattel mortgage which under Arts. 5489, 5490 had to be recorded. Universal Credit Co. v. Fortinberry, 5 Cir., 1933, 63 F.2d 71. See also 4 Collier, Bankruptcy § 70.58 at 1471–76. Possession may be negatived by actual, good faith segregation of the goods, cf. Ribaudo v. Citizens Nat'l Bank, 5 Cir., 1958, 261 F.2d 929. But it is surely present when the dealer, as here, intermingles the "consigned" tires with his own stock and treats them indiscriminately as his own.

But all of these safeguards are swept away by this decision. Whether the dealer is a tire retailer, a dry goods store, general merchandise establishment or automobile dealer, the manufacturer-wholesaler can protect himself absolutely by a simple "warehouse" contract. All he need do to insure that he will always be able to reclaim from his bankrupt dealer goods sold but yet unpaid for is to execute with the dealer at the inception of their business dealings an instrument which on its face creates a consignor-consignee relationship. Then they can deal with each other as sellers and buyers normally do, but with the assurance that should the dealer become bankrupt the supplier—rather than having to share the assets with all the general creditors—will be able to come into the Bankruptcy Court with his "POC" Warehouse Agreement in one hand and a petition for reclamation in the other and reclaim the merchandise.

I therefore dissent.

---

5. Tex.Civ.Stat. art. 5506c (Vernon 1958).

6. Tex.Civ.Stat.Ann. art. 260-1 (Vernon 1959) and see also the similar Florida Statute, Fla.Stat.Ann. ch. 524.04, F.S.A. construed by our Court in Ribaudo v. Citizens Nat'l Bank, 5 Cir., 1958, 261 F.2d 929 (citing many Texas cases); Miami Nat'l Bank v. Knudsen, 5 Cir., 1962, 300 F.2d 289; James Talcott, Inc. v. Wilcox, 5 Cir., 1962, 308 F.2d 546; cf. Blackford v. Commercial Credit Corp., 5 Cir., 1959, 263 F.2d 97.