**GARRETT et al. v. INTERNATIONAL MILLING CO.**

No. 6445.

Court of Civil Appeals of Texas. Texarkana.

Sept. 8, 1949.

Rehearing Denied Sept. 8, 1949.

68

Crenshaw, Dupree, Milam & Crenshaw, Lubbock, Rollins & McWhirter, Greenville, for appellants.

Allen Clark, Greenville, for appellee.

LINCOLN, Justice.

An original submission of this case, the judgment of the district court was reversed and judgment was rendered for appellants. Upon consideration of the appellee's motion for rehearing, said motion is granted to the extent that the original opinion ren-

dered herein on June 30, 1949, is withdrawn and the following opinion is substituted in lieu thereof:

This was a suit by appellee against appellants Jack E. Garrett and Ross E. Garrett, doing business under the name of Lubbock Feed, Seed and Grain Company, for liquidated damages alleged to have resulted from a breach of contract of sale. The appellee alleged that on October 23, 1947, the parties entered into a written contract whereby the plaintiff agreed to sell and the defendant agreed to buy 1200 cwt. of Robin Hood Flour at $7.50 per cwt. A copy of the instrument referred to was attached to the petition. The plaintiff further alleged that on October 30, 1947, a like contract of sale involving 1800 cwt. of Robin Hood Flour at $7.00 per cwt. was executed. After trial to the court judgment was rendered in favor of plaintiff for liquidated damages in the sum of $2,377.47 on the first contract, but the court found in favor of the defendants upon the second contract. There is no appeal nor cross-assignment from the judgment on the second contract referred to.

Prior to June 3, 1947, the appellee was under arrangements with other parties in Lubbock, Texas, as consignment jobbers for appellee's milling products, principally flour. That arrangement was terminated and negotiations resulted in a contract dated June 3, 1947, by the terms whereof the appellants operating under the name of Lubbock Feed, Seed and Grain Company became the consignment jobbers of appellee. The contract of June 3, 1947, is general and provides that the appellee shall ship to the appellants from time to time such products at it shall see fit; that the consignee, appellants herein, will receive the same and store them in the consignee's premises; that the consignee may from time to time sell the goods in the ordinary course of business, at a reasonable profit over and above the wholesale price to be furnished to appellants, making reports from time to time of such sales. The company retained the right at any time to enter on the premises where the goods were stored and inspect and take inventory thereof, take possession of and remove said goods which have not been sold, etc. The contract required the consignee to furnish bond to the company to guarantee the observance of all conditions of the agreement, and the bond was made. The contract specifically provided that the company was not obligated to ship any goods for the purpose of creating a consigned stock, that the company reserved the right to reject any and all of consignee's requests for such shipments, and that the failure or refusal to do so or to maintain the consigned stock should not be construed as a breach of the obligation by the company and would not relieve the consignee from his obligation to carry out his part of the written contract or contracts that he may have heretofore or may hereafter make with the company "for the purchase from the company of any of its products."

Immediately after the date of this contract the milling company proceeded to transfer its products to the appellants' warehouse in Lubbock. Shipments and transfers, some from the former jobbers, some from Oklahoma, and some from other points in Texas, were shipped to the Milling Company, care of Lubbock Feed, Seed and Grain Company. The stock so transferred was listed on regular invoice forms but prices were omitted and each shipment or transfer was marked "Consigned" stock.

Under the arrangements, and by virtue of the contract of June 3, 1947, the appellants were permitted to sell flour and make delivery of same out of the consigned stock. Under all of the testimony, and there is no testimony to the contrary, all flour placed by the milling company in appellants' warehouse at Lubbock was there as consigned stock, title remained in the milling company until it was sold by appellants, and the obligation of appellants was to remit to the appellee at regular intervals for such of the stock as had been sold by them.

Shortly after June 3, additional contracts were executed between appellants and appellee. The record discloses contracts bearing dates July 14, July 30, August 5, October 23 (the instrument now in suit), and October 30, all in 1947. Each of these in-

struments was identical in form with the instrument of October 23, 1947. They were each written on a printed form designated as "sales contract." Each of them carried the following language: "International Milling Company hereby agrees to sell to Lubbock Feed, Seed and Grain Company of Lubbock Texas, who agrees to buy from seller the following described goods (to be manufactured), at the price or prices, in the quantity or quantities, stated below, and on the terms and conditions, and subject to the agreements appearing below and on the back hereof." Then followed the description of the article sold, in every instance it was flour. The merchandise was to be shipped to Lubbock, Texas, "on directions to be hereafter furnished by buyer, shipment to be made by seller as follows:" and then followed the period of time and expiration date for shipment. In each instance freight was allowed by seller to Lubbock, Texas. Each instrument had blanks filled in for the merchandise, price and delivery date, and in that respect, together with the respective dates of the contracts they were different; but in one material respect all the instruments referred to differed from the one of October 23, 1947, in that they each had typed in them under "Terms" the word or words, "consignment," or "consignment basis," or "consigned stock." The instrument dated October 23, 1947 did not have that.

The appellants did not give any shipping instructions under the alleged contract of October 23, 1947. None of the flour mentioned in that instrument found its way into appellants' warehouse at Lubbock. The instrument of October 23, 1947, as well as each of the others, contained numerous provisions authorizing cancellation by seller, among them provisions to the effect that if buyer either informs the seller that buyer will not perform the contract, or if he directs or requests the seller to cancel the contract, or if he admits or asserts buyer's inability to perform the contract, or if he "fails to pay to seller on due date, any indebtedness, heretofore accruing or hereafter accruing to the seller under this or any other contract between seller and buyer, including carrying charges, if any," then

the seller may treat the contract "as if broken by the buyer and cancel entire contract and recover damages calculated" according to a formula appearing in another paragraph of the instrument. The formula referred to provided for liquidated damages.

On March 20, 1948, appellants made to appellee a report of sales, in which it was shown that the appellants owed to appellee about $952.00. This money was due from sales of flour out of the warehouse, all being consigned stock, and having been shipped under previous contracts, but none of it having been shipped under the contract of October 23, 1947. Appellants did not remit the money owing to appellee when it made that report. On March 22, 1948, appellee acting under the provision last above quoted, terminated the contracts of October 23 and October 30, and demanded damages in the sum of $2,377.47 and $477.49, respectively, calculated in accordance with the formula set forth in paragraph 2 of each contract so cancelled.

The appellants assert that the relationship between them and the appellee was that of jobber distributor, that appellee was consignor and appellants were consignees of all milling products shipped to them and that it was the intention of the parties that the appellants were to handle products only on a consignment basis, and that by reason thereof the provisions for liquidated damages were ineffective.

Appellants on the other hand contend that the contract is one of sale for merchandise to be manufactured, that on the same date as the date of the contract, the appellee bought wheat out of which to make the flour named in the contract, thereby "hedging" on the market of that day and that the appellants breached the contract by their failure to pay the sum of $952.00 owing by them on other and different transactions.

The first question presented for consideration is whether this was an outright sale of 1200 cwt. of flour to be manufactured and delivered within the specified time named in the contract of October 23, and upon shipping orders to be furnished by the

appellants, or whether it was a consignment contract. The court found that it was an outright sale and awarded to appellee $2,377.47 as liquidated damages calculated according to the formula referred to, but denied recovery on the contract of October 30, in which appellee sought liquidated damages for the sum of $477.49. Evidently the basis of the court's latter holding was that the contract of October 30, 1947, had the words "consignment basis" typed in under terms, and concluded that the appellee was not entitled to enforce the contract for liquidated damages, in other words, that it was a "Consignment Contract" and not a sale contract. We find that the theory upon which the case was tried was that if the contract was an outright sale the liquidated damages were due, provided they bear a reasonable relationship to the actual damages resulting from the appellants' breach, but if it was a consignment contract the appellee is not entitled to collect the liquidated damages.

The instrument dated October 23, 1947, contained the following provisions, in Paragraph 7 thereof:

"Seller's (appellee's) salesmen have no authority to bind the seller by representation, contract or otherwise."

"This contract shall not bind seller until it has mailed, or telegraphed, direct to buyer, to within or known address, its acceptance or confirmation hereof from its office. Such acceptance shall always be timely if so made not later than 30 days after receipt hereof by seller and shall make contract mutually binding."

On October 30, 1947, the confirmation was formally given by appellee by letter, addressed to appellants at Lubbock, and reads in part as follows: "We are pleased to hereby acknowledge, accept and confirm your contract dated October 23, 1947 * * * of the following described goods, at the price or prices, in the quantity or quantities, stated below, and on the terms and conditions and subject to the agreements set out in your contract." Then follows a description of the goods included in the order, and under the word "Terms" there was typed in the word "consignment."

The word "consignment" did not appear in the original order. It appears in evidence that appellee made up a file or memorandum of the transaction, for use in its offices at Greenville. The instrument shows the buyer, address, date, the merchandise, the date the contract was mailed, date it was received, approvals by various officials, and the words "Terms OK'd by B. J. R. (Confirm Consignment)." On said form the price, the quantity, the package and brand, the destination, and signatures were all "OK'd" by an official of appellee. The instrument was an abstract of the document of October 23. The following appears printed on the bottom of the memorandum: "This form must be completely filled out and stapled to all contracts before acceptable for filing."

The general rules of contract apply to agreements between seller and buyer of personal property. The first canon for interpretation of a contract is to ascertain the intention of the parties. For such intention we must look first to the four corners of the instrument itself. The contract is quite lengthy and complicated, and we will insert only such portions as are applicable to the issues. Such contracts, like all others, must arise upon an offer and acceptance. The acceptance must be unqualified and unconditional, and in the exact terms of the offer. The authorities generally hold that where an order for goods is given to a traveling salesman of seller, and his authority extends only to the solicitation of orders and the forwarding of them for acceptance or confirmation, the order itself constitutes an offer. This rule is concisely stated in 46 Am.Jur., p. 245, as follows: "In the case of orders for goods given to a traveling salesman whose authority extends only to the solicitation of orders and the forwarding of them to his principal for acceptance or confirmation, it is well settled that there is no binding agreement until the order is accepted by the principal. Where the principal reserves the right to pass on the orders given to a traveling salesman, the signature by the salesman of an order does not constitute an acceptance by the principal."

The contract is not complete in such case until its acceptance by the seller, 37 Am. Jur., p. 122; Four States Grocer Co. v. Wickendon, Tex.Civ.App., 217 S.W. 1103; Waco Mill & Elevator Co. v. Allis Chalmers Co., 49 Tex.Civ.App. 426, 109 S.W. 224, writ refused.

In Summers v. Mills et al., 21 Tex. 77, the Supreme Court said: "It does not matter that the difference of terms between the parties may not seem to be very material. If a diversity exists, that fact is enough. To make a contract there must be a mutual assent. The assent must comprehend the whole of the proposition; it must be exactly equal to its extent and provisions, and it must not qualify them by any new matter.' If the answer, 'either in words or effect, departs from the proposition, or varies the terms of the offer, or substitutes for the contract tendered one more satisfactory to the respondent,' there is no assent and no contract. Pars. Cont. 400. 'If a proposition be accompanies with certain conditions or limitations, the acceptance must correspond to it exactly, for if any alteration be suggested, or any exception be made to its exact terms, the provisional acceptance becomes merely a new proposition, which also requires an acceptance.' "

The following additional authorities support the above propositions: Browne Grain Co. v. Walker, Tex.Civ.App., 206 S.W. 859; Whitaker v. Zeihme et al., Tex.Civ. App., 61 S.W. 499; Womack v. Dalton Adding Machine Sales Co., Tex.Civ.App., 285 S.W. 680; Great West Grain & Seed Co. v. Ray, Tex.Civ.App., 204 S.W.2d 26, writ refused, no reversible error; Moore Bros. v. Kirkpatrick, Tex.Civ.App., 172 S.W.2d 135.

Applying the principles above stated to the facts of this case we think that the instrument of October 23, 1947, which was signed by the appellants and by the salesman for appellee, was not a contract, but constituted an offer to buy 1200 cwt. of Robin Hood Flour at $7.50 per cwt. The order required acceptance or confirmation by the appellee before it became effective. The confirmation was required to be given by telegraph or by letter. We find in the record a telegram from the appellee to the appellants of even date with the order, reading as follows: "In accordance with your conversation with Mr. Coats we have booked you 1200 cwt. Robin Hood Enriched Flour at $7.50 per cwt. basis 100# cotton freight allowed to Lubbock, Texas, shipment within 90 days. Please wire us collect as follows your wire received we confirm sale."

This is not a confirmation of the written order. Appellee did not consider it confirmation, because a formal confirmation was subsequently given by appellee, dated at Greenville, Texas, October 30, 1947, and copied in part above. The confirmation given was not unconditional did not "comprehend the whole proposition," and it was not "exactly equal to its (the order's) extent and provisions." The offer embraced within the order was qualified in the confirmation by the insertion of an important new element, that is, by the word "consignment." In other words, the confirmation changed the order from one of outright executory contract of sale to a transaction in consignment.

The confirmation, therefore, resulted in no acceptance of the order. The most that can be said for it is that it constituted a new offer from the seller to the buyer, and did not put the order of October 23, 1947, into effect as a binding contract. It was necessary for appellants to accept or confirm in some manner the order with its change or modification as embraced within the writing of October 30, purporting to be a confirmation. We find no instrument of writing in the record constituting a confirmation by the appellants of the counter-offer made by the appellee in its purported confirmation. Neither is there anything in the record constituting a rejection. We do not think that a rejection was necessary, but an acceptance or confirmation of the counter-offer was necessary.

There is evidence of such acceptance by the appellants to be found in the testimony of witnesses and in the course of dealings between the parties, between October 30,

1947, and March 20, 1948. Without reviewing the evidence we are inclined to hold that the appellants accepted the counter-offer, and that the parties all treated the offer of October 23, 1947, together with the confirmation by appellee on October 30, 1947, as a contract of consignment and not an outright sale.

Only three witnesses testified in the trial. One of the appellants, Jack Garrett, testified, "I didn't buy it outright." At another time he says: "I did not buy anything outright." On cross-examination by appellee he was asked, "Q. Do you claim this was consignment?" And to this question he answered: "Yes, sir; that's the only kind of deal I had with them." On further testimony when called as a witness by his counsel he reiterated this position. G. A. Baldwin was introduced as a witness by appellee. He was general sales manager of appellee. He is the only official of appellee who testified. He was presented with a copy of the order of October 23, 1947, and the following question was propounded and answered: "Q. Now, Mr. Baldwin, isn't it a fact that this order here was to go to the Lubbock Feed, Seed and Grain Company and become a part of their consignment stock? A. That was the intent." At another time Mr. Baldwin testified that "Lubbock Feed and Seed was consignment business."

Tom B. Harris was formerly a salesman for the appellee in Lubbock Territory. He obtained the consignment contract of June 3, 1947, and also the orders of October 23 and October 30, 1947. His testimony shows that the appellants took over the consigned jobbing arrangement in Lubbock under the contract of June 3, 1947. His testimony affirmatively shows that all the flour shipped to Lubbock· Feed, Seed and Grain Company was shipped to appellee in care of the appellants; that he checked the merchandise from time to time, made inspection reports, etc. The merchandise was placed in the warehouse at Lubbock and remained the property of the appellee until it was sold and paid for by appellants. The witness was asked to state whether or not the appellant Lubbock Feed, Seed and Grain Company was to handle appellee's merchandise solely on consignment basis or otherwise, and to the question he answered: "Yes, it was to be handled solely on consignment basis on flour."

The foregoing testimony of the three witnesses shows the interpretation the parties gave to the instruments relied upon by appellee. No issue of their admissibility is raised. We think the testimony shows the interpretation given to the purported contract by the parties themselves. But is may also be said that by reason of the variance between the order of October 23, and the confirmation of October 30, as well as the general course of dealing between the parties, an ambiguity arose as to the meaning of the transaction and the intentions of the parties, and where the contract is ambiguous parol testimony is admissible to show the intention of the parties. "If there were any ambiguity in the contract, it should be resolved in favor of the construction that would make it a bailment." Stieff, Inc., v. City of San Antonio, 130 Tex. 594, 111 S.W.2d 1086, 1090. The testimony of these witnesses, and the written evidence presented in court shows by an overwhelming weight that the parties treated the transaction as a consignment contract. Whether the liquidated damages were collectible for breach of such consignment contract, we are not called upon to say, because the record discloses that all the parties and the court treated the liquidated damage provision as unenforceable if the contract was one of consignment only.

The trial court found that the confirmation of October 30, 1947, wherein the word "consignment" was written in was unilateral, that there was no meeting of the minds of the parties with respect thereto, and that the contract of October 23, 1947, was complete and constituted a binding contract. With these findings and conclusions we are unable to agree. The instrument by its express terms did not result in a contract without written confirmation by the appellee. Insistence upon the proposition that the consignment term stated in the confirmation was unilateral and not binding would leave the appellee in the position of not having confirmed

74

the contract at all, since the confirmation changed the terms of the offer, in which event the appellee would not be entitled to damages of any kind.

On the same date, October 23, two telegrams passed between the parties. The first was from appellee to appellants and is quoted in full above. In reply appellants, same date, sent to appellee the following telegram: "Your wire received. We confirm sale 1200 cwt. Robin Hood Flour at $7.50 per 100 pound cotton freight allowed to Lubbock, Texas, shipment within 90 days."

Appellants urge that the statement above "we confirm sale," coming from appellants to appellee, conclusively establishes that the transaction of October 23, was an executed contract of sale. The most than can be said for it is that the telegram was a declaration against interest but it did not have the effect of conclusively establishing as a matter of law that the transaction was a sale. Furthermore, the alleged contract did not require appellants to confirm. The appellee invited, in fact requested the telegram, and furnished the exact wording of it, by saying, "wire us collect as follows your wire received we confirm sale." Appellants in answering used appellee's words. We do not think the telegram conclusively establishes the ultimate fact, a completed sale. At that time the appellee had not confirmed, as required by the contract. When it did so on October 30, it changed the terms of the contract, if it was a contract, and such changed terms were accepted by the appellants.

We therefore hold that the instrument bearing date October 23, 1947, and appellee's confirmation, and assuming that appellants accepted the changed terms set forth in the confirmation, constitute a contract of consignment only, and being such the appellee is not entitled to the liquidated damages sued for, and the trial court was in error in awarding such recovery.

This holding is conclusive of the whole case, and it is not necessary to pass on other points. Appellee has not sued appellants to collect its defaulted debt of $952.00. It has a bond as security for that debt. This decision is without prejudice to appellee's claim for that debt.

The judgment of the district court is reversed and judgment is here rendered for the appellants.

In all other respects appellants' motion for rehearing is overruled.

Reversed and rendered.