MAPCO INC., Plaintiff-Appellant,

v.

PIONEER CORPORATION and Amarillo Oil Company, Defendants-Appellees.

No. 78–1382.

United States Court of Appeals, Fifth Circuit.

April 10, 1980.

Robert D. Lemon, Robert D. McCutcheon, Perryton, Tex., Holliman, Langholz, Runnels & Dorwart, Frederic Dorwart, J. Michael Medina, Thomas M. Davidson, Gen. Counsel, Rucker, Tabor, McBride & Hopkins, Paul P. McBride, Tulsa, Okl., for plaintiff-appellant.

Locke, Purnell, Boren, Laney & Neely, John L. Estes, Nathan L. Hecht, Dallas, Tex., for Pioneer Corp. and Amarillo Oil Co.

Before TUTTLE, FAY and THOMAS A. CLARK, Circuit Judges.

TUTTLE, Circuit Judge:

This appeal challenges the correctness of the trial court's interpretation of a contract between Mapco's predecessor, Canadian, and the appellee, Amarillo (AOC) which allows Amarillo to continue requiring Mapco to deliver at cost raw natural gas to it in an amount necessary to supply named customers, in the City of Amarillo and its environs, from which stream of gas Amarillo first extracts and markets certain liquid hydrocarbons which it then sells to others than its named customers.

The trial court reached its conclusion by construing the contract between the parties as unambiguously authorizing Amarillo to require delivery of all the gas it needed to supply its customers after it extracted the liquid hydrocarbons from the raw gas, and, alternatively, concluded that if the contract was ambiguous, the course of conduct of the parties over a period of 12 years demonstrated their understanding of the provisions of the contract to be that reached by the court and, moreover, the court found that such conduct by the appellant estopped it from changing its long acceptance of AOC's interpretation of the contract to an inconsistent position.

The appeal is from a non-jury trial as a result of which the trial court made 93 numbered findings of fact which are all accepted without contest by the appellant except for findings numbers 13, 87 and 89. The facts as recited in this opinion will not include those to which Mapco takes exception.

The contract at issue is what is known as the "B" contract, so called because in a 1928 agreement between other parties it was referred to as "Exhibit B." On June 5, 1928 AOC conveyed all of its gas interests in the West Panhandle field of Texas to Canadian and as a part of the same transaction Canadian and AOC executed the "B" contract to sell AOC natural gas from the West Panhandle field. The purpose of the "B" contract was to permit AOC to continue to carry out obligations it had already undertaken with Panhandle Pipeline Company to supply the customers of Panhandle in the City of Amarillo, Texas; and with United States Zinc Company to supply all the natural gas which AOC by contract was required to supply to the company for its smelter at Amarillo; and all the natural gas required by AOC to supply any customers located in the City of Amarillo or its environs which AOC Panhandle or Amarillo Gas Company had then or might thereafter acquire.

The record discloses without dispute that prior to this transaction AOC had been extracting gasoline and some butane from the natural gas as it flowed from the well and it delivered the gas to the Amarillo customers in a less enriched state. In fact, the contract referring to the United States Zinc Company's smelter indicated that AOC was to supply "dry gas" to it.

Continuing after the execution of the 1928 contract, AOC or its assignees extracted such liquid hydrocarbons as the technolo-

gy at the time made valuable for sale separate from the gas subsequently to be used for the Amarillo customers. This state of affairs continued until September 10, 1963 when Mapco acquired the rights previously held by Canadian, which were burdened by the AOC contract of 1928 discussed above. These rights were acquired by what is known as the "Westpan" deed. Mapco's claims here depends solely on the Westpan deed which conveyed to Mapco only what Westpan had obtained from its grantor Canadian. This grant was expressed in a 1959 deed as follows:

. . . Canadian River Gas Company . . . does hereby grant, bargain, sell, transfer, assign, convey and set over unto Grantee all hydrocarbons having a boiling point as high and higher than ethane, including without limitation, all ethane, propane, butanes, pentanes and all heavier hydrocarbons contained in the natural gas in place (all hereinafter referred to as "hydrocarbon constituents"), in and under the lands and leaseholds hereinafter described, *less, however, only such hydrocarbon constituents required in good faith*

(a) to be delivered by Grantor to Amarillo Oil Company (hereinafter called "Amarillo") its successors and assigns, under and pursuant to, and in order to comply with, the terms, as such terms exist at this date, or that certain contract entered into between Grantor and Amarillo, the same being commonly known as the "B" contract, which bears date of January 3, 1928, said "B" contract having been last amended on July 11, 1949. . . .

(Emphasis added.)

In 1965, AOC spent a million and a half dollars rebuilding the extracting plant by which it was withdrawing the liquid hydrocarbons from the gas which it obtained from Mapco to supply its Amarillo customers.

The trial court found that from 1963 onward Mapco knew that AOC was extracting the liquid hydrocarbons from the gas it purchased for Amarillo customers and was shipping them outside of the Amarillo area.

The court also found that no protest or contention was made that this course of conduct was not authorized under the 1928 "B" contract until this suit was filed in 1975.

There is one further fact that we must consider in construing this contract. It is undisputed that the raw gas as delivered by Mapco at the well head could not safely be supplied by AOC under its contract to its customers in Amarillo. Some of the liquids had to be removed from the gas for safe transportation and use. Significantly, there is the unchallenged finding of fact by the trial court, # 93: "There is no evidence of the specific amount or level of liquid hydrocarbons which must be removed from "B" gas to render the gas safely transportable by pipeline."

Since we are interpreting the written "B" contract, it is necessary to set out its text here. The seller in the contract is the predecessor of Mapco and the buyer is AOC:

I. Seller agrees to sell and deliver to Buyer and Buyer agrees to purchase and take from Seller and pay for:

(a) All the natural gas in excess of that purchased by Buyer from other producers required by Buyer for sale under and pursuant to the contract hereto annexed and marked Exhibit "E" to the Panhandle Pipe Line to supply the customers of the Panhandle Pipe Line Company in the City of Amarillo and its environs in the State of Texas;

(b) All the natural gas in excess of that purchased by Buyer from other producers required by Buyer for sale under and pursuant to the contract hereto annexed and marked Exhibit "F" to the United States Zinc Company to supply the United States Zinc Company's smelter located at Amarillo, Texas;

(c) All the natural gas in excess of that purchased by Buyer from other producers required by Buyer to supply any customers located in the City of Amarillo or its environs in the State of

Texas which Buyer, Panhandle Pipe Line Company or the Amarillo Gas Company now has or may hereafter acquire.

\* \* \* \* \* \*

VII. The natural gas delivered hereunder at the gate valves of Seller's wells shall be natural gas as produced in its natural state from the wells. All natural gas delivered hereunder at pipe connections points at which Seller receives natural gas purchased from such other producers shall be natural gas in the state purchased by Seller from such other producers and Seller shall at all times use its best effort to purchase natural gas in its natural state from wells. All natural gas delivered hereunder at a central point at Seller's Amarillo Compressing Station site or from Seller's Amarillo Compressing Station, shall be natural gas resulting from the comingling of natural gas as produced in its natural state from the wells by Seller and natural gas purchased by Seller from other producers.

Mapco's contention is that it delivered natural gas to AOC in such quantities as was necessary to fulfill the latter's contractual obligation to supply the customers in Amarillo, Texas; that the extraction from the gas as delivered at the well head of the liquid hydrocarbons withdrew part of the heating content (BTU's) of the gas, and when these products were sold outside of the City of Amarillo this was a conversion of the liquid hydrocarbons by AOC for which compensation was due. Moreover, Mapco sought a declaratory judgment that AOC's future purchases be limited to the amount of gas that would be sufficient to supply the customers, without having lost any of its heating properties by AOC's extraction procedures.

Mapco attacks the trial court's construction of the contract by stating that the contract is unambiguous (although it argues for a construction 180° from that adopted by the court, which also held that the con-

tract was unambiguous), and that by taking the words as they are written AOC has been demanding and receiving more gas than it contracted for, because of its depleting the gas by the extraction of the liquid hydrocarbons before selling it to its customers. It supports this argument by saying that the contract called for the acquisition by AOC of raw gas and it thus required delivery by AOC to its customers of raw gas. While there was evidence that more BTU's were extracted from the gas than was necessary for AOC to supply its customers, the plaintiff has really not answered the defendant's obviously correct comment that it is conceded that AOC could not deliver the gas in the raw state as is contended for by Mapco.

Appellant then undertakes to strengthen its position by pointing to a rule of construction *inclusio unius est alterior exclusius* (the inclusion of one is the exclusion of another). Mapco points to the distinction between paragraphs 1(a) and 1(b) in the "B" contract on the one hand and paragraph 1(c) on the other. This distinction appears in the fact that paragraph 1(a) refers to obligations of AOC to comply with a specific contract which allowed processing for gasoline and to the obligation of AOC in paragraph 1(b) to comply with a specified contract which also allowed processing. It is clear that paragraph 1(c) merely recognizes the right of AOC to get delivery of the gas "required . . . to supply any customers located in the City of Amarillo, etc." It thus does not refer to a contract which permits processing of the gas. Mapco contends that the inclusion of the right to process for gasoline in the first two instances and the failure to include such a provision in the third requires a construction that AOC did not have the right to process the gas obtained under paragraph 1(c).[1]

Appellee counters by contending that the authorization of processing contained by incorporating the contracts under 1(a) and

---

1. Appellant calls the court's attention to the fact that, so far as it relates to future performance of the contract, only 1(c) is at issue be-

cause there are now no longer any persons who qualify for the delivery of gas under sections 1(a) and 1(b).

1(b) should cause the court to construe 1(c) as authorizing the same treatment. This contention may be called the rule of construction *ejusdem generis*. This rule dictates that, when a proposition is stated in general terms following specific matters the general terms ought to be construed consistently with the specifics. Appellee would have us apply the rule here by stating that since paragraph 1(a) and 1(b) expressly authorized processing of the gas before delivery to the ultimate customers, we should construe paragraph 1(c) in the same manner.

In its turn, appellee relies upon the rule *inclusio unius* by stating that the contract called for the right of the original seller of the gas to process it for helium, thus demonstrating that it knew how to prevent the buyer from processing for a particular hydrocarbon when it saw fit to do so. Thus, the argument goes, the failure in the "B" contract to deny the right to process the gas for other hydrocarbons was a knowing grant of the right by the seller.

█ We find a much clearer and, to the extent that it may be proper to use the term in a contract dispute case, a more equitable basis for construing the contract in favor of the appellee. It is hardly open to Mapco to contend that this contract is not ambiguous, or at least one whose interpretation is not unclear. We are driven to this conclusion, if by nothing else than by the conduct of Mapco itself which clearly indicates that it interpreted the contract for the 12 years between 1963 and 1975 exactly as now contended for by AOC. Where a contract is ambiguous or its interpretation is unclear, both parties agree that the law of Texas is properly stated in our case, *Fowler v. Pennsylvania Tire Co.*, 326 F.2d 526 (5th Cir. 1964). In that case, the court stated:

> As to determining the intent of the parties, the prevailing view is that it will be determined solely by the words employed in the written instrument, where the meaning of such instrument is clear and unambiguous. *Garrett et al. v. International Milling Co.*, (C.A.Tex.), 223

S.W.2d 67; *Edgewood Shoe Factories, Division of General Shoe Corp. v. Stewart*, 5 Cir., 107 F.2d 123; *Samson Tire & Rubber Co. v. Eggleston*, 5 Cir., 45 F.2d 502. But *where the contract or agreement is unclear or of doubtful meaning*, the Court in interpreting what the parties were called upon to do, may properly consider acts done by the parties in the course of performance. *Ross & Sensibaugh v. McLelland*, (C.A.Tex.), 262 S.W.2d 205 reh. den.; *Samson Tire & Rubber Co. v. Eggleston*, supra. The foundation for this latter principle is that a person's construction of his own language constitutes the highest evidence of his intentions. However, this rule is applicable only if the contract is ambiguous or of doubtful meaning; it does not apply to any agreement that is free of ambiguity. See generally, 13 Tex.Jur.2d., Contracts § 128. (Emphasis added.)

█ Here it is clear that both parties to this dispute interpreted the "B" contract as authorizing AOC to extract the liquid hydrocarbons from the gas delivered to it by Mapco, to the extent that they could do so in good faith. The trial court found that all extractions by AOC were made in good faith.

We do not need to consider whether the conduct of Mapco in standing by and letting AOC spend a million and a half dollars to construct its extracting plant in line with this interpretation of the contract, created an estoppel, or, if it did, whether estoppel may be used under the Texas law in defense to a contract action nor do we need to consider whether the principle of laches would apply in an action such as this. The proof is so clear that for the approximately 50 years of the existence of the "B" contract all parties, including Mapco for the last 12 years, construed it as permitting the course of action which Mapco now attacks that we conclude that the trial court was correct in the construction it placed on this contract. As was stated in another opinion of this Court construing a contract of doubtful meaning which gives effect to the parties' own interpretation "this is a logical

extension of a post-contract point of time of the familiar principle that in contract interpretation, the court must put itself in the position of the parties." (footnote omitted). *Travelers Indemnity Co. v. Holman*, 330 F.2d 142, 149 (5th Cir. 1964).

*See also*, Williston on Contracts 3d ed. § 623, Secondary Rules: An Interpretation Given by the Parties Themselves Will be Favored.

The judgment is AFFIRMED.