David W. WISE et al.,
Plaintiffs-Appellants,

v.

BRANIFF AIRWAYS, INCORPORATED
et al., Defendants-Appellees.

No. 79–1013.

United States Court of Appeals,
Fifth Circuit.

July 28, 1980.

Rehearing Denied Sept. 15, 1980.

Les Weisbrod, Marvin Menaker, Dallas, Tex., for plaintiffs-appellants.

Akin, Gump, Hauer & Feld, Charles L. Warren, Laurence J. Hoffman, John J. Gallagher, Washington, D. C., McGuire, Levy, Collins, & McGurley, John E. Collins, Irving, Tex., Thaddeus M. Sims, Atty.—Legal Dept., DFW Airport, Tex., for defendants-appellees.

Before TUTTLE, RANDALL and TATE, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal from the granting of summary judgment dismissing an action brought by 11 radio mechanics of Braniff Airways for refusal to comply with a final grievance settlement, and against their union, for failing fairly to represent them in enforcing the terms of the settlement. We conclude that the trial court erred in dismissing the plaintiffs' case.

The 11 plaintiffs were employed as radio mechanics by Braniff in Dallas at a time when their employer issued certain engineering authorizations (EA's) describing work involved in installing ground proximity warning devices. Braniff assigned the bulk of the work under these EA's to other than radio mechanics.

On May 16, 1975, plaintiff Hull filed a grievance (No. 116–75) as follows:

## GRIEVANCE FORM
### INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS
### AIRLINE DISTRICT NO. 146
### CASE NO. 116–75 DAL

Employer  Braniff Airways                                        L.L. & Location  DAL – 7708

Employee's Name  J. B. Hull                                        Dept.  3521

Home Address  403 Holly           City  Grapevine   State Texas

Telephone No.  481–2735           Date Grievance Occurred

Nature of Grievance  Electrician's being Assigned Work That has in past History been Assigned to Radio EA   6–34–95C   6–34–95D   1–34–288   1–34–289

Settlement Desired:  These EA's To be Assigned in full to Radio 2521 Overtime Rate To be Paid for All Work That has been Done by Electricians

I hereby authorize the International Association of Machinists, with full power of attorney, to represent me in all stages of the Grievance Procedure in the presenting and settling of this grievance.

Date  Filed  5–16–75           Signed  J. B. HULL
(Signature of Employee)

This grievance proceeded through steps 1, 2, and 3 under the collective bargaining agreement. It then proceeded to step 4, where it was on the docket several times for consideration, but was passed over. Finally, at a fourth step meeting on December 15, 1976, the minutes carry the entry

Grievance 116–75 DAL J. B. Hull

Grievance pertains to electricians being assigned work which has been assigned to radio mechanics in the past. The Company agreed to pay as grieved with no precedent set.

The principals at this meeting were J. D. Crow, General Chairman, IAM Airline District 146, who had been fully authorized by the plaintiffs' local to negotiate and settle the grievance, representing the grievants, and D. A. Minter, Staff Vice President of Braniff. Nearly a month later, Minter ad-

dressed a letter to Crow, containing the following language:

Reference Grievance 116–75–DAL, filed by J. B. Hull, the nature of this grievance is electricians being assigned work that has in the past been assigned to Radio, E.A. 6–34–95C, 6–34–95D, 1–34–288 and 1–34–289. The settlement desired is that these E.A.'s be assigned in full to Radio Shop in 3521, and the overtime rate to be paid for all work that has been done by electricians.

As you know, this grievance was settled in our meeting on 12–15–76 and *was to be paid as grieved.* The Company's interpretation of this settlement was we were to pay the radio mechanics for that work which they normally do which had been assigned to the electricians in the abovementioned E.A.'s. It was not our intention to assign all of the work of these E.A.'s to the radio mechanics in that a large portion of the work is electrical work and always has been. There is a portion of the work which should have been assigned to the radio mechanics. [Emphasis added.]

The letter then stated that the total number of hours covered by the four EA's was 8258, whereas Braniff suggested to Crow that only 1728 man hours would be paid by Braniff on the ground that this represented the number of hours of work of the kind that had previously been radio work. Thereafter, without any further discussion with his principals, Crow accepted the payments on behalf of the grievants. The latter contended that Braniff had settled the grievance by agreeing to pay time and a half for the 8258 hours, and that the Company was, thus, liable to them for the difference and that Crow and his union had failed fairly to represent their interests by agreeing to accept less than the full number of hours agreed upon.

The plaintiffs contend that the agreement, recognized as a settlement by Braniff[1] in all of the discussions since the December 15 meeting, plainly and simply provided that the grievants were to be granted their claim in full, that is to say, they were to be paid time and a half for all of the work done under these four EA's, without any further debate or discussion over what part of that work had "in past history been assigned to radio." The defendants, on the other hand, contend that the settlement merely provided that the grievants were to be entitled to be paid at time and a half for that part of the work done under the four EA's that would subsequently be determined to have been "work that has in past history been assigned to radio."

We, therefore, must undertake to construe this written settlement as representing a contract between the parties. Defendants do not contest here the right of the plaintiffs to seek relief under the Railway Labor Act as amended, 45 U.S.C. §§ 151–188 and the Interstate Commerce Act, 49 U.S.C. § 1, *et seq.* They concede that jurisdiction in this Court is proper under 28 U.S.C. § 1291.

We look first to the written terms of the contract to ascertain whether its meaning is readily apparent without consideration of affidavit and deposition evidence relied upon by the defendants to explain the meaning they attributed to it at the time of its execution. *See* Williston (3rd Edition) § 609.

■ Viewing the language of this settlement agreement, we conclude that it meant that the Company agreed with grievant Hull's contention that work assigned to the electricians under EA's 6–34–95C, 6–34–95D, 1–34–288 and 1–34–289 was work that "in past history [had] been assigned to radio" and that these EA's were to be treated as having been performed by the radio mechanics and that since they had not been given the opportunity to perform them, they were to be paid for all the work on these four EA's that had been done by the electricians. This conclusion is inevitable in light of the Company's minute entry for the December 15 meeting where the Company "agreed to pay as grieved." Braniff contends that the Company's agreement to pay

---

1. Note second paragraph in Minter's letter, *supra.*

as grieved was referable only to that part of the grievance form that described the "nature of grievance." If that had been so, then the action of December 15 would have been no settlement at all. It would merely have been an agreement that electricians had been assigned some of the work that had in past history been assigned to the radio, thus leaving open completely the whole question that was raised by the grievance in the first place, to wit, how much of the work on the four EA's was properly that of radio and what part was properly that of the electricians. On the other hand, the use of the word "pay" in the Company's agreement is obviously referable only to that part of the grievance following the heading "settlement desired," at which point it is stated: "Overtime rate to be paid for all work that has been done by electricians." There is not a word of claim for payment contained in the grievance form except in the "settlement desired." Thus, when the Company agreed "to pay as grieved" there could be no other conclusion than that it was agreeing to the entire grievance, which included the desired settlement as an integral part.

We therefore conclude that the written agreement, consisting of the grievance form signed by J. B. Hull and the minute entry produced by the Company became a contractual obligation of the Company to pay in accordance with the "settlement desired" if we are to construe the contract from the words themselves.

We therefore reject Braniff's proposed construction of the language.

The Company, nevertheless, argues that accepting the construction that we have placed on the agreement, then that construction should not be binding, because Mr. Minter, the Company's negotiator, intended something quite different. By deposition, Mr. Minter stated that when he signed the agreement, he intended only to recognize the claim of the grievants to the extent that he would then compute what part of the four EA's were work of a kind that historically had been done by the radio mechanics and would then pay time and a half

for the number of hours thus determined. Of course, what Minter intended by the written contract he signed would obviously have no bearing upon our interpretation of the contract, so Braniff makes a determined effort to show that J. B. Crow, representing the grievants had the same intention at the meeting.

In support of their motion for summary judgment, the defendants appended an affidavit by Crow, which they relied upon to indicate that he, too, intended at the time of settlement to limit the number of hours for which the Company was to pay the radio mechanics. The difficulty here is that Crow's affidavit completely fails to demonstrate any such thing. The most it does is to represent Crow's belief, after the December 15 settlement had been concluded, that one-fourth of the hours should be awarded to the grievants and three-fourths to the electrical engineers. At no place in his affidavit did he state that at the time the Company, acting through Mr. Minter, at the December 15 meeting, agreed to the settlement it was his purpose as representative of the radio plaintiffs to restrict the language in any way contrary to its plain meaning.

The Company also relies upon deposition testimony of Mr. Minter and his superior, Mr. McLachlan, to indicate that when Minter authorized the settlement he understood that Crow had already agreed to his understanding as to what it meant. This evidence, even if admissible to vary the terms of the written contract, is too tenuous and vague to be adequate proof that both parties to the contract intended, at the time of its making, that it represent something entirely different from what it said. Although Braniff's brief states that Mr. McLachlan "had told Mr. Minter prior to the meeting that he had spoken with Mr. Crow, and that Mr. Crow had indicated that the union only wanted payment for that part of the work which had historically been done by the radio mechanics." Mr. McLachlan denies this in his deposition.[2]

Braniff then points to Minter's testimony in an effort to bolster its contention that at the time of the agreement on December 15,

---

2. This deposition contains the following discussion:

Q: Did you have any discussion at all with Mr. Crow over the particulars of any one or more of the grievances?

Crow had the same understanding as to the meaning of the writings as possessed by Mr. Minter. This effort fails because Minter testified that he did not discuss Crow's understanding of the contract before the meeting and because Crow testified in his deposition that the merits were not discussed at the meeting itself.[3] Crow did,

A: In the meeting, no.

Q: Before the meeting?

A: The only thing that he discussed with me was saying that he was—the grievance as written, they were going to go for the radio-men.

Q: As opposed to the electrical?

A: That's correct, yes. He did discuss that with me, yes.

Q: That's all he discussed with you?

A: That's correct.

Q: Tell me, if you could, as much as you remember about that conversation where you say that Mr. Crow told you that they were going to go with the radio as opposed to the electrical.

A: Yes. He said he would go with the radio-men; and I said, fine. And the indications at that time, in fact, directly coming to me, was that they would go that way because they would not be paying in full as this thing indicates.

Q: What do you mean by that?

A: Well, they were asking, I believe, in this thing right there (indicating) that the radio people—the work that had been done by the electricians which should have been done by the radio people—they were going to pay the work that the radio people should be doing as they had in the past.

Q: Okay, excuse me, go ahead.

A: And this settlement desired thing at the bottom here was that these EA's be assigned in full to radio, overtime rate to be paid for all work, such and such.

Q: Would it be a fair statement then that what the grievant was seeking was that they be paid time and a half for all hours that had been worked on these EA's by electrical people?

A: I believe that's what it reads.

Q: And if it was settled to pay as grieved, you would, of course, pay the total number of hours performed by electrical people?

A: No, I would not.

Q: Okay. Was there any other conversation with Mr. Crow other than what you've already told me?

A: Only that there was too many four-step grievances, and I agreed with him.

Q: And he told you that he wanted you at the meeting so that you could try to get some of it settled?

A: He'd like me to come to the meeting and make a statement in regards to how we felt about getting these things solved.

Q: And he also said, I believe you have testified, that they were going to side with the radio as opposed to the electrical?

A: Yes.

Q: You understand, did you not, there was also a grievance pending saying it was all electrical work instead of radio?

A: Yes. In fact, Mr. Faircloth made the statement at the meeting.

Q: What statement?

A: I remember very vividly that the radiomen was the way they were going to go.

Q: As opposed to the electrical people?

A: That's correct.

Q: And, of course, the electrical people were claiming all the work?

A: I believe they were.

Q: And the radio people were claiming all the work?

A: Yes.

Q: And it was your understanding that the Union was going to side with the radio people?

A: Yes.

Q: Did you talk with Mr. Minter about the settlement prior to the meeting?

A: No.

Q: Did you talk to him at the meeting about it?

A: No.

**3.** Crow's testimony at this point follows:

Q: Okay. So then did you have the meeting on December the 15th, 1976?

A: Yes.

Q: Okay. Any discussion of Grievance 116–75?

A: To the best of my knowledge, the grievance wasn't discussed except in the light that, if memory serves me correctly, Mr. Faircloth made the statement at the opening of the meeting that we were at fault, we had two grievances up to the fourth step and had been there for some time, one of them from the Electricians and one of them from the Radio and we couldn't have two grievances on the same thing and the Union was going to withdraw the Electricians' grievance.

Q: Okay. Was that the extent of the discussion?

A: I think that was the extent of the discussion and then Mr. Minter started going down the list of the grievances that the Company was willing to settle.

Q: Okay. And was one of those grievances Grievance 116–75?

A: That's correct.

Q: Is that correct?

A: That's correct.

later, testify that having settled the claim for less than one-fourth of the amount his principals were bargaining for, he believed that the terms of the settlement were fully carried out. Of course, this was a legal conclusion as to the meaning of a written contract and has no bearing on the case.

■ We have outlined the elements of proof upon which Braniff relies to support the trial court's granting of summary judgment in its favor, apparently on the theory that the contract did not have the meaning which we have attributed to it or, if it did, then it was not the contract between the parties because the two signatories meant something quite different from what it said. Having held that the contract is unambiguous, the applicable rule was stated by us in *Mapco, Inc. v. Pioneer Corp.*, 615 F.2d 297 (5th Cir. 1980). In *Mapco*, this Court announce the rule of interpretation where a contract is ambiguous or its interpretation is unclear. We then cited our previous case, *Fowler v. Pennsylvania Tire Co.*, 326 F.2d 526 (5th Cir. 1964), some of the language of which is apposite here where the contract is unambiguous:

> As to determining the intent of the parties, the prevailing view is that it will be determined solely by the words employed in the written instrument, where the meaning of such instrument is clear and unambiguous. *Garrett et al. v. International Milling Co.*, (D.A.Tex.Civ. App.), 223 S.W.2d 67; *Edgewood Shoe Factories, Division of General Shoe Corp. v. Stewart*, 5 Cir., 107 F.2d 123; *Samson Tire & Rubber Co. v. Eggleston*, 5 Cir., 45 F.2d 502. . . .

615 F.2d at 301.

From what we have shown of the evidence relied upon by Braniff, it is clear that the trial court could not have entered a summary judgment, even if it had concluded that the contract was ambiguous, for the evidence is conflicting at best as to what the Union representative intended at the time of the December 15 meeting. It is clear that he had been claiming on behalf of the Union up to that very date whatever the grievance stated and it is clear that

Minter understood that up to that date the Union was claiming payment at time and a half for all of the hours spent on these four EA's. Moreover, when asked by counsel upon the taking of his deposition whether the minute entry "means whatever it says?" he answered: "That's what it says. It speaks for itself." It seems clear, thus, that Mr. Minter was stating that he still meant to rely upon the minute entry and the grievance as a contract and he was merely undertaking to interpret it, a task that was not his but is one which we must face.

■ In view of our construction of the writings between the parties, we conclude that on the record as it now stands, there can be only one result, a recovery by the plaintiffs for the amount which the Company agreed to pay them. However, since appellate courts, rarely, if ever, remand a case to the district court with directions to enter a summary judgment in favor of a plaintiff, we reverse the judgment below and remand the case for further proceedings not inconsistent with this opinion.

We do not reach the second issue raised by plaintiffs, that is whether the union negotiator failed fairly to represent them when he undertook to modify the settlement by agreeing to take less than one-fourth of the amount of the settlement. Since we hold that the December 15th settlement was binding on Braniff, there was nothing to settle thereafter and Crow's action had no effect on the rights of the plaintiffs.

REVERSED and REMANDED.